## BAYER CO., Inc., v. UNITED DRUG CO.

(District Court, S. D. New York.   April 14, 1921.)

1. **Trade-marks and trade-names ☞71—Some protection justified if name describes both drug and source of origin.**

    If the name under which plaintiff sold a drug invented by it has come to describe both the drug and its origin from a single source, some protection to plaintiff is justified, even though the identity of the source was not known to the public; the law of "secondary meaning" is built upon such presupposition.

2. **Trade-marks and trade-names ☞71—No relief granted when buyers understand word to mean only the kind of goods.**

    If buyers of a drug sold by plaintiff under a trade-name understand by the name only the kind of goods sold, plaintiff is not entitled to prevent the use of the name by others whatever efforts it may have made to get buyers to understand the name as referring to the source of origin.

3. **Trade-marks and trade-names ☞93(1)—Burden on defendant to show that coined word means only the kind of drug.**

    Where the name under which plaintiff sold a drug invented by it was a coined word meaning nothing by itself, defendant, when sued for an injunction to prevent its use of the trade-name, must show that to buyers such name means only the kind of drug.

4. **Trade-marks and trade-names ☞71—That drug was patented material, but not controlling.**

    That a drug sold under a trade-name was patented until 1917 is material, but not controlling, in determining whether to buyers the name means the kind of goods or the source of origin.

5. **Trade-marks and trade-names ☞78—No relief unless deception will presumptively result.**

    While it is convenient for many purposes to treat a trade-mark as property, the right to relief always depends upon the principle that no man shall be allowed to mislead people into supposing that his goods are those of another, and there can be no right or remedy until plaintiff can show at least presumptively that this will result.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. Trade-marks and trade-names** &copy;&rarr;**71—Plaintiff entitled to protection as to buyers to whom trade-name indicated the manufacturer.**

Where plaintiff sold a drug invented by it to manufacturing chemists, physicians, and retail druggists under names adequately describing its chemical organization and always asserted in its advertisements, etc., that the trade-name "aspirin" meant its own manufacture, defendant was not entitled to sell such drug to manufacturing chemists, physicians, and retail druggists under such trade-name.

**7. Trade-marks and trade-names** &copy;&rarr;**71—Plaintiff not entitled to protection as to general public because trade-name had come to mean the article sold.**

Where plaintiff originally sold a patented drug invented by it in powder form to be dispensed on prescription and later permitted manufacturing chemists, to which it sold to furnish it to retailers in tablet form, and for years permitted them to be sold under its trade-name "Aspirin" with nothing to indicate that they were of its manufacture and with some indication of the name of the maker leading the public to believe that the drug was made by large chemists indiscriminately, and, though it later required sales to be made under its own name, the name had not acquired a secondary meaning prior to the expiration of its patent monopoly, defendant could not be prevented from selling the drug to the general public under such trade-name.

**8. Trade-marks and trade-names** &copy;&rarr;**71—That similar drug was sold under another name held not to show that trade-name referred to origin.**

Where a drug manufactured by plaintiff and furnished to manufacturing chemists was sold by them under a trade-name with nothing to indicate that it was manufactured by plaintiff, the fact that the same drug was on the market under another name did not entitle plaintiff to relief on the theory that the trade-name referred only to the drug manufactured by it, where there was no evidence that buyers knew the different names referred to the same drug.

**9. Trade-marks and trade-names** &copy;&rarr;**67—One not selling to public cannot have trade-mark conditioned upon such sales.**

A drug manufacturer cannot refrain from advertising and selling a drug directly to the consumer and yet get a trade-mark conditioned in fact upon such direct sales.

**10. Trade-marks and trade-names** &copy;&rarr;**8—No rights in word as such.**

There is no invention in a word, as a word, which can be protected under the rules applicable to trade-marks.

**11. Trade-marks and trade-names** &copy;&rarr;**97—Form of injunction when name has different meaning to different classes.**

Where a trade-mark was understood by the public to refer to the drug sold under such name, but by manufacturing chemists, retail druggists and physicians to mean only such drug when manufactured by plaintiff, defendant *held* to be enjoined only from using the trade-name in sales to manufacturing chemists, physicians, and retail druggists with the right, in sales to retail druggists, to label small bottles and boxes intended for sale to the consumer with the trade-name when wrapped or boxed in containers bearing the chemical name.

**12. Trade-marks and trade-names** &copy;&rarr;**71—Use of trade-name followed by defendant's initials enjoined.**

Where for years plaintiff had sold its drug to manufacturing chemists who sold it in tablet form under plaintiff's trade-name "Aspirin" followed by the chemist's initials, etc., so that such markings had come to mean to the trade tablets made from plaintiff's powder, defendant will be enjoined from using the trade-name followed by its initials in sales to the trade.

**13. Trade-marks and trade-names** &copy;&rarr;**71—Use of trade-name preceded by the word "genuine" prohibited.**

Where plaintiff for years permitted a drug invented by it to be sold under its trade-name "Aspirin" with nothing to indicate that the drug was

manufactured by it, so that the name had come to refer to the drug, but later sold the drug under its own name, so that some buyers understood that the trade-name referred only to plaintiff's goods, defendant's sale of its drug as "genuine Aspirin" will be enjoined.

In Equity. Suit by the Bayer Company, Incorporated, against the United Drug Company. Decree for plaintiff for part only of the relief sought.

This is a suit in equity between the plaintiff, a New York corporation, and the defendant, a Massachusetts corporation, to enjoin infringement of the plaintiff's common-law trade-mark "Aspirin." The bill was filed in May, 1917, and alleged that the plaintiff or its predecessors had since 1899 been selling throughout the United States a drug known as "acetyl salicylic acid," to which they had given the artificial trade-mark "Aspirin"; that they had expended large sums of money in popularizing the trade-mark so adopted, which had thus become a synonym for the acetyl salicylic acid manufactured by them; that on May 5, 1899, the plaintiff's predecessor had registered this trade-mark in the United States, and that the plaintiff held both the common-law and the registered mark by proper assignments; that the value of the amount in controversy was more than $5,000; and that the defendant had infringed the mark by using the word "Aspirin" in the sale of acetyl salicylic acid. The bill also charged the defendant with unfair trade in its advertisements of acetyl salicylic acid in the failure to discriminate sufficiently between its own manufacture and the plaintiff's. It prayed the usual injunction in such cases.

The answer denied the main facts and alleged that on August 1, 1898, the plaintiff's predecessor had applied for a patent for "acetyl salicylic acid" which issued on February, 1900, and expired on February twenty-seventh, 1917, and that thereafter the product fell into the public domain and with it the word, "Aspirin," which had become the name for the drug and therefore descriptive. It denied the charges of unfair trade in the bill.

The facts shown upon the trial were in substance as follows: The predecessor of the plaintiff was a German corporation engaged in the manufacture of chemical products, among them the drug in question, which was its own invention. On August 1, 1898, it applied for a patent in the United States, and therein described the drug as "acetyl salicylic acid." This patent issued on February 27, 1900, and therefore expired 17 years thereafter. It was eventually sustained by the courts, and in theory should have given the plaintiff or its predecessors a monopoly of production. This, however, was not the case, at least for a long time, and probably not altogether at any time. Large quantities of it were surreptitiously introduced into this country and sold, and while the amounts are necessarily somewhat uncertain, the plaintiff showed that considerably more than 220 tons had in fact been imported, of which it is fair to presume that all or nearly all reached the eventual consumer. This represented a very substantial proportion of the drug manufactured and sold by the plaintiff itself or its predecessors. It is impossible to ascertain how much, if any, of this infringing drug was marketed under the name "Aspirin," but it is probable that little or none of it reached the retail druggists under that name.

The plaintiff called a number of retail druggists, who swore with substantial unanimity that they had never sold the infringing drug to the consumer under the name "Aspirin," and in many cases that the customers themselves asked for it as "Acetylo" or as "acetyl salicylic acid." In Europe, where the plaintiff's predecessor appears not to have enjoyed the benefit of a patent, the drug was manufactured in open competition, but the name "Aspirin" was uniformly respected as a trade-mark, other manufacturers selling either under the name mentioned in the patent or under artificial trade-marks invented by the manufacturers themselves.

The importation into this country by the plaintiff's predecessor began some time in the year 1899 and before the patent issued. At that time it was all

sold in the form of powder, and for some years only to manufacturing chemists, retail druggists, or to physicians. The plaintiff's predecessor, however, did make it up into sample tablets, which it sent gratuitously to all or nearly all the physicians in the country in small quantities. It registered the name as a trade-mark on May 2, 1899. It advertised very largely in technical magazines, and in all its advertisements and on all its labels claimed the word "Aspirin" as its trade-mark. For example, this legend was commonly employed: "The word 'Aspirin' identifies it as the manufacture of" the plaintiff or its predecessors. None of these advertisements, however, were to the public at large, nor did any of the packages reach further than physicians, manufacturing chemists, or retail druggists. In its powder form it was only prescribed by physicians, except as now to be stated.

About 1904 the plaintiff's predecessor began to sell the powder in increasingly large quantities to wholesale manufacturing chemists, understanding that they would make it up into tablets to dispense to retail druggists in bottles containing 5,000, 1,000, 500, and 100 tablets. These chemists, who comprised nearly all the large houses in the country, sold the tablets to retailers under the name "Aspirin," and in no case did the name of the plaintiff or its predecessors appear upon the labels. Moreover, the manufacturing chemist in each case used his own name upon the bottle, e. g., "Aspirin, Squibb," or simply, "Aspirin," with his name or initials below. The tablets soon occupied by far the greater part of the field, the prescription by powder very largely decreasing in proportion, and remaining only in those cases in which a prescription required the drug as one ingredient. The tablet trade grew to very large proportions, amounting in the case of the defendant alone in two years to nearly 16,000,000 tablets, and in the case of Smith, Klein & French in nine years to about 6,000,000. The drug proving useful, the public in time thus acquired the habit of self-medication by means of it and bought it either by fives or dozens from the retail druggists, or in bottles of 50 or 100, and possibly in some instances even more. During this period the plaintiff or its predecessors continued its former policy of addressing only the drug trade or physicians, and the public continued to have no greater information than before of who was in fact manufacturing the drug under the name "Aspirin."

In the autumn of 1915, however, the plaintiff adopted another policy, and refused thereafter to sell the powder to manufacturing chemists, preferring to make up the tablets for itself. These it widely advertised by direct appeal to the consuming public, and sold in very large quantities, in small tin boxes of as few as 12 tablets to the box. The boxes were marked as follows: "Bayer—Tablets of Aspirin"—and on the bottom side the legend: "The trade-mark 'Aspirin' (Reg. U. S. Pat. Office) is a guarantee that the monoaceticacidester of salicylicacid in these tablets is of the reliable Bayer manufacture." The name "monoaceticacidester of salicylicacid" had been substituted about the year 1904 by the plaintiff as a descriptive name for the drug, the name "acetyl salicylic acid" having been abandoned thereafter. Larger quantities of tablets or capsules, 24, 50, and 100, were sold in bottles and these all bore the words, "Bayer—Tablets of Aspirin" or "capsules," and the same legend as did the tin boxes.

This was about 17 months before the patent expired, and the wholesale chemists were obliged to sell the tablets under the make-up just mentioned or not to get them at all. When the patent did expire at the end of February, 1917, these chemists differed in their treatment of the trade-mark. Some agreed to respect it as such, while others, of whom the defendant was one, insisted that it had become a descriptive name for the drug, and that the right to use it was free to the public along with its manufacture. This is the issue which this case invites.

On the charge of unfair trade the plaintiff proved that the defendant advertised the drug of its own manufacture as "genuine Aspirin," and asserted that in other ways not necessary to describe it gave color to the supposition that its product had been made by plaintiff.

On November 30, 1918, an examiner of the Patent Office declared that the trade-mark was no longer valid and ordered its cancellation. From this decision no appeal was taken, and that feature of the case therefore falls out of consideration.

Livingston Gifford and C. G. Heylmun, both of New York City, and Edward S. Rogers, of Chicago, Ill., for plaintiff.

Laurence A. Janney, of Chicago, Ill., for defendant.

LEARNED HAND, District Judge (after stating the facts as above). The issues in this case do not, I think, depend upon the decision in Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118, so much as the defendant supposes. That case decided no more than that the existence of a patent during the period when the goods became known to the public might be a controlling element in determining whether the name under which they were sold indicated a single source of origin. Since then courts have several times said that the name of goods protected by patent might in fact indicate not only the kind of goods they were, but as well that they emanated from a single source. President Suspender Co. v. Macwilliam, 238 Fed. 159, 151 C. C. A. 235; Hughes v. Alfred H. Smith Co., 209 Fed. 37, 126 C. C. A. 179; Scandinavia Belting Co. v. Asbestos, etc., Co., 257 Fed. 937, 960, 169 C. C. A. 87; Searchlight Gas Co. v. Prest-o-Lite Co., 215 Fed. 693, 695, 131 C. C. A. 626.

[1] So here it might be that the name "Aspirin" in fact had come at once to describe the drug in question and also its origin from a single source. If it did, that would be enough to justify some protection, since the identity of the source need not be known. Birmingham, etc., Co. v. Powell, [1897] App. Cas. 710; Wetherspoon v. Currie, L. R. 5. H. L. 508. Indeed, the whole law of "secondary meaning" is built upon that presupposition.

[2-4] The single question, as I view it, in all these cases, is merely one of fact: What do the buyers understand by the word for whose use the parties are contending? If they understand by it only the kind of goods sold, then, I take it, it makes no difference whatever what efforts the plaintiff has made to get them to understand more. He has failed, and he cannot say that, when the defendant uses the word, he is taking away customers who wanted to deal with him, however closely disguised he may be allowed to keep his identity. So here the question is whether the buyers merely understood that the word "Aspirin" meant this kind of drug, or whether it meant that and more than that; i. e., that it came from the same single, though, if one please anonymous, source from which they had got it before. Prima facie I should say, since the word is coined and means nothing by itself, that the defendant must show that it means only the kind of drug to which it applies. The fact that it was patented until 1917 is indeed a material circumstance, but it is not necessarily controlling.

[5] In deciding that issue I cannot, however, approach the question formally, as the plaintiff wishes; as to say that there was a user before the patent, and therefore the patent could not forfeit this property right, or that there was never any intention to abandon the trademark and so it must have continued. No doubt it is convenient for many purposes to treat a trade-mark as property; yet we shall never, I think, keep clear in our ideas on this subject, unless we remember that relief always depends upon the idea that no man shall be allowed to

mislead people into supposing that his goods are the plaintiff's, and that there can be no right or remedy until the plaintiff can show that at least presumptively this will result. Hanover Milling Co. v. Metcalf, 240 U. S. 403, 36 Sup. Ct. 357, 60 L. Ed. 709.

[6] In the case at bar the evidence shows that there is a class of buyers to whom the word "Aspirin" has always signified the plaintiff, more specifically indeed than was necessary for its protection. I refer to manufacturing chemists, to physicians, and probably to retail druggists. From 1899 it flooded the mails with assertions that "Aspirin" meant its own manufacture. This was done in pamphlets, advertisements in trade papers, on the packages and cartons, and by the gratuitous distribution of samples. True, after 1904 it abandoned the phrase "acetyl salicylic acid" for "monoaceticacidester of salicylicacid," but even that extraordinary collocation of letters was intelligible to these classes of buyers who, except possibly the more ignorant of the retail druggists, were measurably versed in the general jargon of pharmaceutical chemistry. Moreover, the drug continued to be generally known by the more tolerable phrase "acetyl salicylic acid," which also adequately described its chemical organization. As to these buyers the plaintiff has therefore, I think, made out a case at least to compel the addition of some distinguishing suffix, even though its monopoly had been more perfect than in fact it was.

[7] The crux of this controversy, however, lies not in the use of the word to these buyers, but to the general consuming public, composed of all sorts of buyers from those somewhat acquainted with pharmaceutical terms to those who knew nothing of them. The only reasonable inference from the evidence is that these did not understand by the word anything more than a kind of drug to which for one reason or another they had become habituated. It is quite clear that while the drug was sold as powder this must have been so. It was dispensed substantially altogether on prescription during this period, and, although physicians appear to have used the terms, "Aspirin" or "acetyl salicylic acid" indifferently, it cannot be that such patients as read their prescriptions attributed to "Aspirin" any other meaning than as an ingredient in a general compound, to which faith and science might impart therapeutic virtue. Nor is there any evidence that such as may have seen both terms identified them as the same drug. I cannot speculate as to how many in fact did so. No packages could possibly have reached the consumer, nor was any advertising addressed to them; their only acquaintance with the word was as the name for a drug in whose curative properties they had got confidence.

In 1904, however, they began to get acquainted with it in a different way, for then all the larger manufacturing chemists began to make tablets, and the trade grew to extraordinary proportions. The consumer, as both sides agree, had long before the autumn of 1915 very largely abandoned consultation with physicians and assumed the right to drug himself as his own prudence and moderation might prescribe. In all cases—omitting for the moment the infringing product—the drug was sold in bottles labeled "Aspirin" with some indication of the name of the tablet maker, but none of the plaintiff. It is probable that

by far the greater part of the tablets sold were in dozens or less, and that the bottles so labeled did not generally reach the hands of the consumer, but, even so, a not inconsiderable number of bottles of 100 were sold, and as to the rest they were sold only under the name "Aspirin." The consumer did not know and could not possibly know the manufacturer of the drug which he got, or whether one or more chemists made it in the United States. He never heard the name "acetyl salicylic acid" as applied to it, and without some education could not possibly have kept it in his mind, if he had. So far as any means of information at all were open to him, they indicated that it was made by most large chemists indiscriminately.

This being the situation up to the autumn of 1915, the defendant seems to me to have effectually rebutted any presumption which the coined word might carry. However, the plaintiff argues along with this user large infringing sales of the drug were being made to consumers under the name "acetyl salicylic acid." It has indeed proved that it was unable absolutely to protect the monopoly of the patent, and it is clear that large quantities were piratically sold, though, so far as this record shows, with uniform respect for its trade-mark. Further, a good many retail druggists swore, with undoubted truth, that their customers got accustomed to the use of the phrase and could either ask for the drug or get it written out on a slip of paper and present that. I think I must accept the record as showing that this went on to a substantial, though obviously to a wholly indeterminate, extent. However, I need not accept, because I do not believe, that all the piratical drug was sold to the consumer under the name "acetyl salicylic acid." This is inherently improbable, and evidence to the contrary was not produced by, and naturally not available to, the plaintiff.

[8] Aside from the fact that there is authority for saying that the inadequacy of the patent wholly to protect the plaintiff is immaterial. (Horlick's Food Co. v. Elgin Milkine Co., 120 Fed. 264, 56 C. C. A. 544), this evidence does not appear to me to help the plaintiff at all. It shows nothing more than that there was a class of buyers who knew a drug going by the name "acetyl salicylic acid," which was useful for some purposes, in fact (though this they did not necessarily know), the same as those for which "Aspirin" was useful. There is no evidence that these buyers knew that this drug was the same as "Aspirin," or that they ever asked for or bought "Aspirin." Nor is there any evidence, as I have already said (and this is the critical point), that with rare exceptions those who asked for and knew "Aspirin" identified it with "acetyl salicylic acid," or supposed that "Aspirin" was that drug, when made by some one in particular. They bought tablets of various manufacture, and if they knew of the different tablet makers, they would, as above stated, have supposed that not only the tablets, but the drug itself, were made by the chemists from whom it apparently emanated. For these reasons I do not regard the sales of "acetyl salicylic acid" by that name as material to the issue between the parties here.

After the autumn of 1915 the plaintiff totally changed its methods, and thereafter no tablets reached the consumer without its own name. But it is significant that even then it used the word "Aspirin" as though

it was a general term, although it is true that there was ample notice upon the bottles and boxes that "Aspirin" meant its manufacture. The most striking part of the label read, "Bayer—Tablets of Aspirin." While this did not show any abandonment of the name, which there has never been, it did show how the plaintiff itself recognized the meaning which the word had acquired, because the phrase most properly means that these tablets were Bayer's make of the drug known as "Aspirin." It presupposes that the persons reached were using the word to denote a kind of product. Were it not so, why the addition of "Bayer," and especially why the significant word "of"?

Disregarding this, however, it was too late in the autumn of 1915 to reclaim the word which had already passed into the public domain. If the consuming public had once learned to know "Aspirin" as the accepted name for the drug, perhaps it is true that an extended course of education might have added to it some proprietary meaning, but it would be very difficult to prove that it had been done in 17 months, and in any case the plaintiff does not try to prove it. The issue in this aspect, indeed, becomes whether during that period the word had obtained a secondary meaning, and I do not understand that any such thing is claimed. If it is, I own I cannot find any basis for it in the record. Probably what really happened was that the plaintiff awoke to the fact that on the expiration of the patent its trade-mark would be questioned, and strove to do what it could to relieve it of any doubts. Yet, had it not been indifferent to the results of selling to the consumer, it could have protected itself just as well at the time when consumers began to buy directly as in 1915. Nothing would have been easier than to insist that the tablet makers should market the drug in small tin boxes bearing the plaintiff's name, or to take over the sale just as it did later. Instead of this, they allowed the manufacturing chemists to build up this part of the demand without regard to the trade-mark. Having made that bed, they must be content to lie in it. Hence it appears to me that nothing happening between October, 1915, and March, 1917, will serve to turn the word into a trade-mark.

[9] The plaintiff argues that, if it is to be so treated, it is impossible to get a trade-mark for an "ethical" remedy, which apparently means a remedy not directly advertised or sold to the public. But it must not blow hot and cold. If a manufacturer thinks it undesirable to advertise and sell drugs direct, the inevitable consequence of adhering to that standard is that no trade-mark among consumers can be acquired, because they can know nothing of it. Virtue in such cases must be its own reward, or must realize its material profits in the long cast. Moreover, the plaintiff's complaint comes now with doubtful consistency after some 16 years of sales in one way or another without the intervention of physicians. It can scarcely claim to have been ignorant of the fact that the millions of tablets which were being sold before October, 1915, were in large part sold direct, and that, if it was not itself addressing the consumer, it had become unnecessary to do so. I do not suggest that there was the least impropriety in all this, but it appears to me to leave little ground for asserting that its superior virtue has been the cause of its undoing. Besides, how-

ever much can be made of this before October, 1915, thereafter the plaintiff certainly felt no compunctions. Now its drug was no different then from itself in 1899; nor was there, I think, any less danger from self-medication. They had, indeed, through their admirable methods of introducing it, given it a good reputation, consonant with their own very high standing, but that seems to me rather an instance of the skill with which their business was conducted, than of scruples, which, in the light of subsequent events, they would, I should say, have always thought overstrained. But, however all that may be, they cannot, of course, get a trade-mark conditioned in fact upon directly addressing the consumer, and maintain a reputation based upon never doing so.

[10] There are words, such as "Lactobacilline" (29 Rep. Pat. Cas. 497), "Vaseline" (19 Rep. Pat. Cas. 342), "Argyrol" ([C. C.] 164 Fed. 213), "Valvoline" ([C. C.] 38 Fed. 922), or "Celluloid" ([C. C.] 32 Fed. 94), which may at once mean both the kind of goods and their maker. These will be entitled to a qualified protection. The most striking illustration is perhaps Singer Mfg. Co. v. June Mfg. Co., supra, itself, where the putative mark was a proper name. The validity of a trade-mark does not, indeed, rigidly depend upon its meaning only the differential between a genus, defined by the kind of goods, and a species, defined by that kind when emanating from the owner. Guastavino v. Comerma (C. C.) 180 Fed. 920. When it means the owner as well as the kind, it will be entitled to a qualified protection; when, as here among the trade, there is another current word, it may be entitled to an absolute protection, patent or not. For a patent gives the public no greater rights than it has without patent. We speak of a dedication of the disclosure, but that is rather for convenience. In fact, the public may always practice the invention, except as the monopoly interferes, and it gets that right independently of the patent. But when, as here among consumers, a mark does not give even an intimation of the owner, there is no room at all for any protection. Centaur Co. v. Heinsfurter, 84 Fed. 955, 28 C. C. A. 581; Linoleum Mfg. Co. v. Nairn, L. R. 7 Ch. Div. 834. After all presumptions and other procedural advantages have been weighed, the owner must show that his mark means him, else he cannot prevent others from using it. There is no invention in the word, qua word, which he can protect.

[11] The case, therefore, presents a situation in which, ignoring sporadic exceptions, the trade is divided into two classes, separated by vital differences. One, the manufacturing chemists, retail druggists, and physicians, has been educated to understand that "Aspirin" means the plaintiff's manufacture, and has recourse to another and an intelligible name for it, actually in use among them. The other, the consumers, the plaintiff has, consciously I must assume, allowed to acquaint themselves with the drug only by the name "Aspirin," and has not succeeded in advising that the word means the plaintiff at all. If the defendant is allowed to continue the use of the word of the first class, certainly without any condition, there is a chance that it may get customers away from the plaintiff by deception. On the other hand, if the plaintiff is allowed a monopoly of the word as against

consumers, it will deprive the defendant, and the trade in general, of the right effectually to dispose of the drug by the only description which will be understood. It appears to me that the relief granted cannot in justice to either party disregard this division; each party has won, and each has lost.

The plaintiff argues that this is an innovation in the law. I think not. In two very recent cases the Supreme Court has taken the very point, though the division chanced to be territorial instead of arising from the facts of the market. In Hanover Milling Co. v. Metcalf, 240 U. S. 403, 36 Sup. Ct. 357, 60 L. Ed. 713, and United Drug Co. v. Rectanus, 248 U. S. 90, 39 Sup. Ct. 48, 63 L. Ed. 141, a trade-mark and a trade-name were refused protection, though valid elsewhere, in parts of the country where the buyers did not know that they signified the owner, and because they did not. Mr. Justice Pitney especially adverted to the basis upon which the whole law rests. "Cessit ratio, cessit lex." If the rule applies to vertical divisions of the demand, it must apply to horizontal. Of course, we must not attempt too fine an application of such divisions, one reason perhaps for Mr. Justice Holmes' concurring opinion in Hanover Mills v. Metcalf, supra. For example, in the case at bar it is impossible to provide for such rare retailers as may not, and such rare customers as may, know that "Aspirin" is a trade-mark. We can cut only so fine as our shears permit, and there will be ragged edges on either side.

[12] As to the first class the question arises whether the injunction should be absolute or conditional. A strong case may be made for the defendant's present labels. They all bear the letters "U. D. Co." in juxtaposition with "Aspirin" and of equal size. These letters are universally known by the trade to signify the plaintiff, because the custom is general for manufacturing chemists in this way to mark their goods. I think that the plaintiff would be adequately protected but for the 10 years' history of the tablet trade. However, the fact is that during that time such legends were used to indicate that the manufacturing chemist who signed, as it were, the label, was making the tablets from the plaintiff's powder. Probably at present that belief has largely disappeared, but, since we are dealing with customers who are presumably aware of that history, and who have been repeatedly told that "Aspirin" signifies the plaintiff, I can see no reason for subjecting it to the chance. The phrase "acetyl salicylic acid" to them is intelligible; it means the same drug as "Aspirin," and its use ought not unduly to hamper the trade in its business. Besides, the case in this aspect is one of trade-mark proper. Therefore I will grant an injunction against direct sales of the drug under the name "Aspirin" to manufacturing chemists, physicians, and retail druggists. This will, of course, include invoices and correspondence.

In sales to consumers there need, however, be no suffix or qualification whatever. In so far as customers came to identify the plaintiff with "Aspirin" between October, 1915, and March, 1917, this may do it some injustice, but it is impracticable to give any protection based on that possibility. Among consumers generally the name has gone into the public domain. The defendant, as I understand it, makes no

direct sales, and all its transactions will therefore probably fall within the injunction, but the sale of its stockholding retailers will be free, and it may so instruct them. Moreover, I see no reason why the defendant should be compelled to sell in such large bottles or boxes that the retailers must bottle or box tablets for themselves. This is a trade advantage which conceivably may be of capital consequence in competition. True, it must sell to these retailers clearly under the name "acetyl salicylic acid," but the retailers may themselves use the word "Aspirin." So it seems to me that the defendant should be allowed to pack its tablets in bottles or boxes of 50 or less, bearing the name "Aspirin" without more. These must, however, be sold to the retailers as acetyl salicylic acid, and when shipped must be inclosed in a container marked only "acetyl salicylic acid," with the defendant's name on it. I have limited the quantity to 50 because it seems to me that in greater quantities the permission might be a means by which the retailers could sell the drug to physicians as "Aspirin." True, some physicians may buy as little as 50 at a time, just as some consumers in fact buy more. But some compromise must be made. If there are physicians who buy in such small quantities, the plaintiff must rely upon preventing the retailers from using these bottles; if there are consumers who wish more, the defendant must submit to the disadvantage that the retailers must sell 2 at a time, or must relabel a bottle of 100.

[13] The unfair trade aspect of the case requires little consideration. I can see nothing in the advertisements of the retail shops which is open to criticism, except the use of the adjective "genuine" before "Aspirin." Of course, to those who know the drug only by that name this is not misleading; yet it is hard to escape the suspicion that the purpose was broader, perhaps to catch these consumers who have become conscious of the secondary meaning of the word; i. e., those whom the plaintiff's advertising since October, 1915, has reached. "Pure" or "unadulterated" would serve equally well for the purpose and would be free from any possible objection. Perhaps there are other inoffensive adjectives. The injunction may include the use of "genuine." Criticism of the advertisement of "100," etc., appears to me a little overstrained.

I have not considered the question of the plaintiff's title, as I assume, in view of the limited relief granted, the defendant will not care to press it. If not, I will do so upon request made within 10 days after this opinion is filed.

There will be no costs. I append a form for the mandatory part of the decree as to the trade-mark, which will serve unless the parties wish to have it modified:

"Against using the word 'Aspirin' in correspondence, invoices, bills of lading, and the like, or upon cartons, labels, or other marking, in any sales of 'acetyl salicylic acid' to manufacturing chemists, wholesale or retail druggists, or physicians. The defendant will be free to sell 'acetyl salicylic acid' direct to consumers under the name 'Aspirin' without suffix or qualification. The defendant in sales to retail druggists will also be free to pack tablets in bottles and boxes of fifty or less, labeled, 'Aspirin,' provided these bottles or boxes be wrapped or

boxed in containers marked 'acetyl salicylic acid manufactured by U. D. Co.,' without the word 'Aspirin,' and that in making such sales the correspondence, invoices, bills of lading, and the like refer to the drug so sold only as 'acetyl salicylic acid.'"