223 F.2d 195
 105 U.S.P.Q. 462
 NATIONAL LEAD COMPANY, a Corporation, Appellant,
v.
Bernard M. WOLFE and Frederick J. Dannenfelser, Individuals
and Copartners, Doing Business Under the Names and
Styles 'Dutch Paint Co.,' and 'Manning-
Mitchell Paint Co.,' Appellees.
 No. 13737.
 United States Court of Appeals Ninth Circuit.
 May 17, 1955
Rehearing Denied July 14, 1955.
 
 Robert E. Burns, Crimmins, Kent, Draper & Bradley, San Francisco, Cal., James D. Ewing, New York City, Milton Handler, San Francisco, Cal., John B. Henrick, New York City, for appellant.
 James M. Naylor, Frank A. Neal, Naylor & Lassagne, San Francisco, Cal., for appellee.
 Before DENMAN, Chief Judge, POPE, Circuit Judge, and BYRNE, District judge.
 POPE, Circuit Judge.
 
 
 1
 The plaintiffs-appellees, citizens of the State of California, brought a suit for declaratory relief against the defendant-appellant, a New Jersey corporation, praying for an adjudication that the plaintiffs' use of the words 'Dutch', 'Dutch Paint Company' and 'Dutch Paint' in connection with the paint and paint products manufactured and processed by them does not infringe the rights of appellant in its trade mark 'Dutch Boy'.
 
 
 2
 Appellant, by counterclaim, alleged its prior adoption and use of the trade mark 'Dutch Boy', the registration of this mark, for paint products, in the United States Patent Office in 1937; that it has built up a large and profitable business in its products identified with that trade mark and has spent large sums in advertising it; that since 1949 the appellees, with knowledge of appellant's trade mark, have used the words 'Dutch Paint Company', 'Dutch' and 'Dutch Paint' in connection with their manufacture and advertising of paint products in a manner calculated and liable to confuse and deceive the public in believing that appellees' products are manufactured by or originate with the appellant; that this was unfair competition as well as infringement of appellant's trade mark and its registration.
 
 
 3
 Upon this counterclaim the appellant sought an injunction against further use by the appellees of the words objected to; an accounting of profits from the alleged infringement of the trade mark, and an award of damages.
 
 
 4
 The case was tried and all testimony taken before Honorable Herbert W. Erskine, District Judge, who died before he could make or file any findings in the case. By agreement of the parties the cause was submitted to the Honorable Edward P. Murphy upon the record of the testimony and other evidence previously presented to Judge Erskine. The court made findings of fact and entered a judgment in favor of the appellees as plaintiffs and dismissed the appellant's counterclaim. Upon this appeal the specifications of error in the main assert the right of appellant to have judgment upon this counterclaim.
 
 
 5
 The record shows that the appellant is a large and well known manufacturer of paint and paint products which it has sold to the trade and the consuming public throughout the country for more than 40 years. In 1907 it adopted a picture of a Dutch boy as its trade mark for white lead. Subsequently it commenced using the words 'Dutch Boy' in its advertising and these words were applied successively to linseed oil, red lead paint, white lead paint, flatting oil, wall primer and other paint products. The word trade mark 'Dutch Boy' was registered in the Patent Office in 1937 for a number of paints and paint products including inside and outside paints, primers, undercoats, lacquers and varnishes. All these uses antedated by a considerable number of years the appellees' entry into the paint business. In connection with its sales of Dutch Boy paints appellant made very large expenditures devoted to advertising its Dutch Boy trade mark. Its products were shown to be regularly sold through independent dealers as well as through its 39 retail stores. There were some 1200 of these dealers in the eleven Pacific Coast states. Appellant's sales of paint products bearing this trade mark have aggregated over six hundred million dollars and it has expended in excess of nineteen million dollars in national advertising.[1]
 
 
 6
 The appellees on the other hand entered the paint business in 1946 after their discharge from the Navy where they had had some training in connection with the naval paint program. After initiating the paint business and incorporating their enterprise under the name of Manning-Mitchell, Inc., they had some difficulty in procuring raw materials for their marine paints. Then in the same year they acquired for some $9,000 a partnership concern known as 'Dutch Paint Co.' at San Francisco which operated a small paint factory and which had on hand some labels marked 'Dutch Paint'.[2] Thereafter the appellees formed a new corporation called 'Dutch Paint Company' and continued to increase the manufacture and sale of household and other paints using labels and other marks with the names 'Dutch' and 'Dutch Paint'. It is of this use that appellant complains in its counterclaim.
 
 
 7
 The record shows beyond possible controversy that the appellants had a trade mark valid both at common law and under the applicable federal acts.[3] Neither the word 'Dutch', nor the words 'Dutch Boy' are used otherwise than in a fictitious, arbitrary and fanciful manner. Of course the word 'Dutch' is capable of being used as a geographical term. If used to indicate a product made in Holland or by some Dutch process, it could be a descriptive term. However, the record shows without doubt that appellant's trade mark does not contain words having either a geographical or descriptive sense. In this respect the case is governed by Hamilton-Brown Shoe Co. v. Wolf Brothers & Co., 240 U.S. 251, 36 S.Ct. 269, 271, 60 L.Ed. 629, where the court said: 'We do not regard the words 'The American Girl,' adopted and employed by complainant in connection with shoes of its manufacture, as being a geographical or descriptive term. It does not signify that the shoes are manufactured in America, or intended to be sold or used in America, nor does it indicate the quality or characteristics of the shoes. Indeed, it does not, in its primary signification, indicate shoes at all. It is a fanciful designation, arbitrarily selected by complainant's predecessors to designate shoes of their manufacture. We are convinced that it was subject to appropriation for that purpose, and it abundantly appears to have been appropriated and used by complainant and those under whom it claims. * * * 'The American Girl' would be as descriptive of almost any article of manufacture as of shoes; that is to say, not descriptive at all.'
 
 
 8
 Here there is no likelihood that the use of the name 'Dutch' or 'Dutch Boy' in connection with the appellant's goods would be understood by purchasers as representing that the goods or their constitutent materials were produced or processed in Holland or that they are of the same distinctive kind or quality as those produced, processed or used in that place.[4]
 
 
 9
 The record and briefs do not disclose any assertion on the part of the appellees that appellant's trade mark was wholly without validity. Appellees however contend that the mark is not a 'strong' but a 'weak' mark, citing as their authority for this position this court's decisions in Sunbeam Furniture Corporation v. Sunbeam Corporation, 9 Cir., 191 F.2d 141, and Sunbeam Lighting Co. v. Sunbeam Corporation, 9 Cir., 183 F.2d 969. We find no resemblance between this case and our Sunbeam cases for in those cases it was pointed out that the name Sunbeam was 'a meaningful word, a joyful word, a word of comfort, and of health.' It was therefore held that its use was not sufficiently fanciful to warrant the granting of an injunction not merely against the use of the term 'Sunbeam' on the defendants' lamps but against the use of the firm name 'Sunbeam Furniture Corporation.'
 
 
 10
 The fact that 'Dutch' as a dictionary term has a geographical significance and that it would be possible for a manufacturer to use that word in connection with his business in its primary geographical sense is beside the point here. Thus one who manufactures paint in Holland cannot be restrained from selling his product as 'Dutch' paint any more than a watch manufacturer in Switzerland can be prevented from selling his 'Swiss' watches. No use of the word 'Dutch' in a geographical sense is involved here for neither appellant nor appellees are marketing products or goods 'likely to be understood by purchasers as representing that the goods or their constituent materials were produced or processed in the place designated by the name or that they are of some distinctive kind or quality as the goods produced, processed or used in that place.'[5]
 
 
 11
 The distinction is well made by the Supreme Court in Hamilton-Brown Shoe Co. v. Wolf Brothers & Co., supra, where it contrasted with the valid use of 'The American Girl' the supposititious use of a mark 'American Shoes'. As the appellees are not making their paints in Holland or using any Dutch processes or giving them any distinctive Dutch quality, the fact that others might have done so is of no significance in this case. There is no question also that 'Dutch' has certain descriptive meanings. Thus 'Dutch Kalsomine Brushes', the record shows, are paint brushes of a special construction; 'Dutch White' and 'Dutch Blue' are terms describing certain colors under which some paints are sold although not those of the appellees; 'Dutch Process', or 'Old Dutch Process' is a means of making white lead used in Holland and some manufacturers of white lead use that process and make reference to it on their labels; 'Dutch Enamel' is a term descriptive of a kind of enamel first developed in Holland. Neither appellant nor appellees are engaged in the utilization of any such processes and the words 'Dutch', 'Dutch Paint', or 'Dutch Paint Company' used by appellees are not claimed to have any relation to any product now or ever made in Holland or any process, color, or other description related to Holland or the Dutch.
 
 
 12
 We conclude therefore that the appellant's trade-mark was one entitled to full protection both under the rules of the common law and under the federal acts.[6]
 
 
 13
 Under the rules and decisions generally applicable, the appellees' use of the terms here complained of would constitute an actionable infringement of the appellant's trade-mark. We note here, in connection with appellees' competing business, the use of a designation which is 'confusingly similar to the (appellant's) trade name.'[7] Under § 32 of the Lanham Act, 15 U.S.C.A. § 1114, to the protection of which appellant is entitled, the infringement is the use, without the registrant's consent, of 'any registered mark in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services * * *.'
 
 
 14
 That we have a case here of confusing similarity is very apparent and the facts of the case are not to be distinguished from those in a multitude of decisions finding infringement. Among those cases are Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195; Brooks Bros. v. Brooks Clothing of California, 9 Cir., 158 F.2d 798, adopting opinion D.C., 60 F.Supp. 442; Lane Bryant, Inc. v. Maternity Lane, 9 Cir., 173 F.2d 559. Here there is confusing similarity between the appellant's trade-mark and the words used by the appellees in respect to appearance, sound and meaning. The great mass of cases cited by Callman in § 82.1 of his work on Unfair Competition and Trade-Marks, 2d Ed., in which confusing similarity in sound, appearance or meaning, or in some of these respects, was found to exist, make it clear that in using the words 'Dutch', 'Dutch Paint', or 'Dutch Paint Company' in connection with their products, appellees are guilty of infringement of the appellant's trade mark. The evidence here satisfies the standards of proof set forth in Mershon v. Pachmayr, 9 Cir., 220 F.2d 879: 'There is ample evidence in the case to require the finding that there was material confusion just as the court said there would be, and that there was strong likelihood that there would be confusion, although actual confusion is not essential in the proof of infringing a trade-mark.'[8]
 
 
 15
 However, the appellant produced a mass of evidence which was uncontradicted showing some 290 instances in which paint dealers, painters, industrial users of paints and retail customers were actually deceived or misled by the appellees' use of 'Dutch', 'Dutch Paint', 'Dutch Paint Company', and by their advertisements, into believing that appellees' paints were actually the appellant's Dutch Boy paints. This evidence of actual confusion showed that it occurred in some 20 communities in California, and in communities in Washington, Oregon, Idaho, Utah, Wyoming, and Nevada, and even in Hawaii. Some of these witnesses were experienced painters or construction superintendents; others were individual consumers purchasing for their own use. Testimony was given by some of appellant's dealers and employees who related many instances of confusion on the part of the consumers visiting the stores. In addition there was substantial testimony that dealers in paints who were accustomed to purchase paint at wholesale, were confused into believing that the appellees, 'Dutch Paint' was appellant's 'Dutch Boy Paint'.
 
 
 16
 Notwithstanding this extensive proof not only of likelihood of confusion but of actual confusion as well, and notwithstanding the evidence was uncontradicted, the trial court found that there were no purchasers who were confused[9] as between defendant's and plaintiffs' products and concluded that there was a lack of similarity because the names differed in sound, significance and appearance. We are unable to perceive how the court could have made such a finding in the light of this record. The court's findings upon this point are clearly erroneous.
 
 
 17
 The record also shows that not only did the appellees beginning in 1946 adopt these confusingly similar names but shortly thereafter the method of advertising their paint showed that their continued use of these names and the passing off of their products thereunder was intentionally false and misleading and done with a purpose on their part of deceiving prospective purchasers. Thus appellees advertised 'New Lower Than Pre-War Prices on Dutch Paint'. The facts were, as appellees knew them, that their Dutch paints were not in business before the war and they had no pre-war prices. They also knew that the appellant's Dutch Boy paint had been sold long prior to the war. They also advertised 'How Can $2.95 Buy $6 Paint?', offering their Dutch paint 'at approximately 50% of the normal price'. Appellees never sold $6 paints; $2.95 was their normal price, although it was approximately 50% of the normal Dutch Boy price. They advertised 'Quality Famous Dutch Paint' which they represented as selling for half price at $2.95.
 
 
 18
 The proof of this deliberately false and misleading use of advertising in connection with the appellees' own infringement, has an important bearing upon the inferences to be drawn with respect to the existence of confusion. The rule respecting the consequences of this intent to deceive was stated in My-T-Fine Corporation v. Samuels, 2 Cir., 69 F.2d 76, 77, as follows: 'But when it (intent to deceive) appears, we think that it has an important procedural result; a late comer who deliberately copies the dress of his competitions already in the field, must at least prove that his effort has been futile. Prima facie the court will treat his opinion so disclosed as expert and will not assume that it was erroneous. * * * He may indeed succeed in showing that it was; that, however bad his purpose, it will fail in execution; if he does, he will win. * * * But such an intent raises a presumption that customers will be deceived.'[10]
 
 
 19
 Appellees attempt to meet the appellant's showing of infringement by setting up defenses of laches, acquiescence and estoppel. The record does not sustain any of them.
 
 
 20
 The record is that early in 1947, a then partner and associate of the appellees assured the appellant's manager that they intended to discontinue their use of the name 'Dutch' as soon as they had exhausted their supply of labels. In March, 1948, there was a discussion between appellant's advertising manager and the appellees in which the former discussed with appellees the question of the appellees abandoning the use of the word 'Dutch'. The advertising manager testified that appellees indicated their intention to drop this brand as soon as there was an ample supply of raw materials for other kinds of paints. The appellees' version of the conversation is that the manager asked them if they had thought of abandoning the use of the word 'Dutch' and they replied that they could not do so as they were obliged to manufacture Dutch paints because of pigment shortage.
 
 
 21
 Whichever be the correct version, plainly appellant was endeavoring to canvass the possibility of removing the infringement in 1948. The suit was begun in October, 1949. The attempted proof of laches is too trivial to require serious consideration. In the light of the intentional and fraudulent use of appellant's trade mark, the defense here is a frivolous one. Menendez v. Holt, 128 U.S. 514, 523, 9 S.Ct. 143, 32 L.Ed. 526.
 
 
 22
 The claim of acquiescence is equally groundless. Thus, it is argued that on the occasion previously mentioned when the advertising manager of appellant met with the appellees, the manager confined his objections to certain radio advertising on a Sacramento radio station; but that the failure of the advertising manager to make additional objections particularly to the newspaper advertisements which appellees were running, and his failure to make a stronger showing of force against the use of the word 'Dutch Paint' in connection with appellees' product, amounted to an acquiescence.[11]
 
 
 23
 The record also shows that some of the appellant's employees and salesmen during the years 1946-1947-1948 occasionally visited the appellees' offices and knew that the word 'Dutch' was displayed on signs and paint cans. There was also produced at the trial a letter written by one Kaegebehn, the manager of appellant's patent department, to the appellant's advertising manager. This contained a statement that 'Dutch' is a geographical name, and as such, it is not registrable as a trademark, but if used exclusively, it may acquire secondary trademark significance. However our mark is Dutch Boy and we can only enforce that mark against others under the trade mark laws.' The writer of the letter was not a lawyer; the letter was an intra-company communication, never addressed to anyone outside the appellant company, and there was no reliance upon it by appellees. Cf. Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 247 F. 407.[12]
 
 
 24
 Appellees began their use of the words here objected to in 1946. In 1947 they gave assurance they would shortly discontinue this use. In March, 1948, appellant was negotiating with appellees in an effort to procure a promise to discontinue. Formal notice of infringement was given in July, 1949, and the suit begun in October of the same year. Laches, acquiescence, or estoppel are wholly wanting here.
 
 
 25
 The appellees attempted to show that a large number of other persons had used the name 'Dutch' or some combination thereof in connection with sales of paint, and it is contended that the showing made in this respect justifies the trial court's findings and judgment against the appellant's claim of a valid trade mark and infringement thereof. The suggestion is that these third party uses of the term 'Dutch' in the paint industry have been so numerous and so general that the mark must be held to be a weak mark within the meaning of the Sunbeam cases, supra, and further, that the term 'Dutch' has become publici juris as in the cases of 'aspirin' and cellophane'.[13]
 
 
 26
 Appellees have attached to their brief in this court a tabulation which was an exhibit in the court below showing uses which third parties, manufacturers or dealers in paint have made of names which include the word 'Dutch'. Substantially the same information was portrayed in a photograph which was also an exhibit and which showed in color paint cans to which were attached labels with trade marks using the word 'Dutch'. A study of the 39 listed uses of the word 'Dutch' reveals that some of them are duplications, some relate to uses discontinued many years ago, some were used but to a limited extent and in single communities or limited localities far from the Pacific Coast to which appellees' operations were confined, and for the most part in the eastern portion of the United States,[14] and some with respect to which there was no proof of any sale whatever; some relate to non-paint products such as floor wax. The remaining proven third party uses of the word 'Dutch' in connection with paint sale or manufacture[15] are too inconsequential to establish a claim of publici juris or the claim that appellant's mark has become a weak mark or to justify on any other theory the acts of these appellees. It may be that some of these third persons may also have been guilty of wrongful infringement, but such would not be a defense or justification for the appellees. It is no excuse for them to say that others have been guilty of the same wrong. Del Monte Special Food Co. v. California Packing Corp., Corp., 9 Cir., 34 F.2d 774; Potter-Wrightington, Corp., 9 Cir., 34 F.2d 774; Potter-Wrightington, 1 Cir., 298 F. 398, affirming D.C., 288 F. 597. Uses of the offending word in local areas in the East are no justification for acts of appellees on the Pacific Coast.[16]
 
 
 27
 The findings of the trial court fail to note that these third party uses fall into these various categories. The court failed to note that, as earlier here indicated, no one questions the possibility of using the word 'Dutch' in a geographical or descriptive sense. Some of the third party uses listed in the findings, without noting this distinction, were instances where such proper and unobjectionable uses were made, as in the case of 'Dutch Kalsomine', 'Dutch White', 'Old Dutch' process. Again there was no breakdown of those uses which were local and far distant from the area of appellees' user. And since the trial court's findings were based upon the same cold record which is before us, we are 'in as good a position as the trial court was to appraise the evidence.'[17] We find no evidence to warrant a holding that appellant's trade-mark had become publici juris, or that the word 'Dutch', when used as appellees have done, was publici juris. The third party uses as are shown are not such as would permit an inference of acquiescence. We find here no evidence that on originally distinctive mark changed or developed into a generic term.
 
 
 28
 There is also a contention that there was an abandonment of the trade-mark by the appellant. No evidence thereof appears in this regard for there was no evidence of any intent whatever to abandon. Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 31, 21 S.Ct. 7. 45 L.Ed. 60.
 
 
 29
 What we have said heretofore has in terms referred to the trade-mark infringement. That, however, is but one aspect of the larger filed of unfair competition. It requires no extended discussion in view of what we have said to demonstrate that the acts here complained of are not only an infringement of trade-mark but they constitute acts of unfair competition. The law is stated in Weinstock, Lubin & Co. v. Marks, 109 Cal. 529, 541, 42 P. 142, 146, 30 L.R.A. 182: '* * * Upon what principle of law can a court of equity say, 'If you cheat and defraud your competitor in business by taking his name, the court will give relief against you, but, if you cheat and defraud him by assuming a disguise of a different character, your acts are beyond the law?' Equity will not concern itself about the means by which fraud is done. It is the results arising from the means-- it is the fraud itself-- with which it deals. The foregoing principles of law do not apply alone to the protection of parties having trade-marks and trade-names. They reach away beyond that, and apply to all cases where fraud is practiced by one in securing the trade of a rival dealer; and these ways are as many and as various as the ingenuity of the dishonest schemer can invent.'[18]
 
 
 30
 In order to make out a case of unfair competition, it is only required that the natural and necessary consequence of appellees' conduct in this respect was such as to cause deception.[19] The case of Ross-Whitney Corp. v. Smith Kline & French Lab., 9 Cir., 207 F.2d 190, sufficiently demonstrates that wholly apart from trade-mark infringement, the appellant had here made out a case of unfair competition and that the court below had jurisdiction thereof.
 
 
 31
 In view of the demonstration in the court below that the appellees' use of 'Dutch Paint' and 'Dutch Paint Company' was by false and misleading advertising, and the consequent demonstration that there was a deliberate and intentional design to cause confusion and mistake and to deceive purchasers, the conclusion must be that whether the cause be viewed as one of unfair competition or as one of infringement of a registered trade-mark, appellant is entitled not merely to relief by injunction but to an accounting of profits and damages as well. 'But where an injunction is had against unfair competition, willfully conducted by the defendant with knowledge of the plaintiff's rights, an accounting normally follows.' Matzger v. Vinikow, 9 Cir., 17 F.2d 581, 584.
 
 
 32
 As for appellant's rights under the trade-mark acts, since this is not a case where there has been 'no showing of fraud or palming off', cf. Champion Spark Plug Co. v. Sanders, 331, U.S. 125, 131, 67 S.Ct. 1136, 1139, 91 L.Ed. 1386, but where the showing is quite to the contrary and the intentional misleading has been demonstrated, appellant is entitled not merely to an injunction as prayed for but to an accounting of appellees' profits and a recovery of any damages sustained under the provisions of Title 15 U.S.C.A. § 1117, pursuant to the rule of Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381.
 
 
 33
 Accordingly the judgment is reversed and the cause is remanded with directions to dismiss the appellees' complaint, to grant to the appellant an injunction as prayed for in its answer and counterclaim, and to proceed to take an accounting of the appellees' profits, and to determine appellant's damages as directed in this opinion.
 
 
 
 [1]
 The findings reflect the difficulty of the trial judge in dealing with a record of evidence none of which he had heard from the lips of witnesses. Thus he appears to have overlooked the extensive testimony, uncontradicted, as to the many years of selling and advertising Dutch Boy paints, long prior to the appellees' commencement of the business, and limited himself on this subject to a finding as follows: 'The earliest national advertisement of the 'Dutch Boy' blue and white label products was in 1947, and the earliest reference to 'Dutch Boy' paints as distinguished from white lead, in defendant's national advertising, occurred in 1950'. The impression given is that appellant did not begin to advertise its paints, and particularly its mixed ready to use paints, at least on the national scale, until 1947 or even 1950
 The record is quite otherwise. As appears from the deposition of appellant's advertising manager, since 1913 appellant had been promoting the sale, on a national scale, of ready mixed paint bearing conspicuous labels with its trade mark. In the early 1930's ready mixed paints called 'Colors in Oil' were sold throughout the country under the conspicuous Dutch Boy label. Its 1937 trade mark registration was for numerous paints and paint products including 'ready mixed paints for exterior use' and 'ready mixed paints for interior use'. Beginning in 1918 what were known as 'flatting paints' were sold under the Dutch Boy trade mark; and in the years between 1930 and 1940 similar Dutch Boy labels were applied to white lead paint, lead mixing oil, gloss enamels, varnish, quick drying enamel, enamel undercoat, semi-gloss, Flat wall paint, wall primer, one coat flat wall base and liquid dryer. The record includes numerous photographs of samples of appellant's paint containers bearing the Dutch Boy label as distributed nation-wide in the years prior to 1940. Some of these were on products such as linseed oil and flatting oil, apparently for use of professional painters in mixing paint, but many of them are of mixed ready for use paints designed for sale to the consumers such as 'Dutch Boy Outside White', 'Dutch Boy Satin Egg-Shell', 'Dutch Boy Interior White'.
 Since 1938 appellant produced a full line of more than 30 types of ready mixed paints, each in a variety of colors, and all particularly designed for consumer's use. All were displayed bearing this label among the stocks of independent dealers nation-wide as well as in the company's own retail stores. These products were pushed with particular vigor in the area west of the Rocky Mountains. About 1930 appellant took over a concern manufacturing a full line of paints known as Bass-Heuter of San Francisco, and thereafter put out the full line of paint products of that concern using the Dutch Boy label thereon with a smaller insert marked 'formerly Bass-Heuter'.
 During the period following 1914 appellant advertised its trade mark products by distributing for use of painters millions of 'wet-paint' signs bearing the Dutch Boy trade mark. From 1928 on it advertised its Dutch Boy products in approximately 200 newspapers throughout the country of which 40 or 50 were on the Pacific Coast. Displayed in the record are exhibits of circulars advertising Dutch Boy painters' products which were distributed to dealers throughout the country in quantities aggregating hundreds of thousands. During this period the Dutch Boy trade mark was advertised in national magazines such as the Saturday Evening Post and Colliers, and in the farm journals.
 The independent dealers in Dutch Boy paint were furnished fluorescent and Neon signs. At least 30,000 of such signs have been distributed since 1915, about 15% of which were installed at the stores selling the products on the Pacific Coast. Mammoth Neon signs bearing the trade-mark were located for outdoor advertising at places of maximum automobile traffic in New York, Los Angeles, Buffalo, Philadelphia, St. Louis, Chicago, Pittsburg, Cleveland and Cincinnati.
 The case was tried in 1950 and the appellant's advertising manager in testifying produced color advertisements currently appearing that year in national magazines bearing the phrase 'Dutch Boy Paints'. The unfortunate reference in the quoted finding to the year 1950 is based upon the testimony of appellant's advertising manager that 'that particular phrase' first appeared in those 1950 advertisements. The result of this wholly unwarranted finding is that it gives an erroneous impression that appellant an erroneous impression that appellant had only 'come lately' with its trade mark into the mixed paint field.
 
 
 [2]
 The district court's findings erroneously recite that this Dutch Paint Co. had been producing 'Dutch Paint' since 1941. There is no evidence upon the subject other than that 'Dutch Paint Co.' was listed in the telephone book from 1941 on. When it began producing, or when it made its 'Dutch Paint' labels, does not appear
 
 
 [3]
 Although the record discloses no attack on the registration of appellant's trade mark, the trial court failed to make any finding thereon, or even to note the fact of registration in the findings
 
 
 [4]
 See comment on Subdivision (a) of § 720 Restatement of Law of Torts, as follows: 'Arbitrary of fanciful use. The reasons for the rule that geographical names cannot be trade-marks do not weigh heavily when the geographical name has obviously only an arbitrary or fanciful significance in connection with the goods upon which it is used. Thus Gibraltar may be a trade-mark for automobiles since there is no likelihood that such use of the name would lead purchasers to suppose that there is any particular relation between the automobiles and the geographical locations known by that name, or any likelihood that it would seriously interfere with the freedom of merchants at Gibraltar to use that name. Again, Ethiopian may be a proper trademark for ladies' stocking; for, while suggestive of a certain color and sheen, it is only fancifully so and there is no likelihood that other merchants may have occasion properly to use the name Ethiopia on stockings since there is no factor of importance associating stockings with Ethiopia. Such is also the case of Pacific for bread or Arctic for refrigerators.'
 
 
 [5]
 The words quoted are taken from Restatement of Torts, § 720(a)
 
 
 [6]
 It was alleged in the counterclaim and admitted in the response that a valid registration of the mark 'Dutch Boy', obtained under the Act of February 20, 1905, is entitled to the benefits and remedies provided under the Lanham Trade-Mark Act of July 5, 1946, 60 Stat. 427, 15 U.S.C.A. § 1051 et seq., by virtue of § 46(b) of that Act, 15 U.S.C.A. § 1051 note. The section mentioned provides that 'registrations now existing under * * * the Act of February 20, 1905 shall continue in full force and effect for the unexpired terms thereof * * *. Such registrations and the renewals thereof shall be subject to and shall be entitled to the benefits of the provisions of this Act (with certain exceptions not here applicable).'
 
 
 [7]
 The quoted words are from Restatement of Torts, § 717(1)(a)
 
 
 [8]
 See the discussion in Callman, Unfair Competition Trade-Marks, 2d Ed., §§ 82.3 and 80.6
 
 
 [9]
 Apparently appellees have abandoned any effort to sustain this finding of no confusion, for speaking of the testimony of appellant's witnesses on this point, appellees' brief says that 'it is apparent that the presence of the common word 'Dutch' was the sole cause of their several mistakes.'
 
 
 [10]
 To the same effect see comment 'f' to § 729(b) Restatement of Torts: 'But if he adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, his intent may be sufficient to justify the inference that there is confusing similarity.' See also Safeway Stores v. Dunnell, 9 Cir., 172 F.2d 649, 656: 'Dunnell, with his eyes open, thus chose to seek the benefit of Store's vast expenditures for advertising on the chance that it might prove enjoinable.' Cf. Stork Restaurant v. Sahati, 9 Cir., 166 F.2d 348
 
 
 [11]
 This was the occasion previously mentioned on which, according to the testimony of both appellees, appellant's representative asked them 'Have you ever given any thought to abandoning the use of the word 'Dutch'?' It was appellant's version of this conversation that appellees indicated an intention ultimately to drop the Dutch Paint brand and to go into a line of marine paints. Disregarding appellant's version, it is plain that the parties then discussed the matter of appellees' giving up the use of the Dutch Paint name
 
 
 [12]
 Appellees learned of this letter only after the action was begun, and through discovery processes. It was not even admissible in evidence. Overlooking this, and the rule of the Aunt Jemima Mills case, the trial court appears to have attached considerable significance to it for its finding 33 reads: 'Mr. C. F. Kaegebehn, Manager of defendant's Patent Department, admitted that National Lead Company did not have 'proprietary legal exclusive right to the word 'Dutch' in connection with paint and paint products,' the while suggesting that a 'show of force' by defendant be used in lieu of such right.' Actually, in the same letter, Kaegebehn was urging the company representative to which it was addressed to advise all persons using the phrase Dutch Paint that the company was prepared to enforce its legal rights 'to the utmost'. The letter can have no significance in support of a claim either of acquiescence or of estoppel
 
 
 [13]
 Bayer Co., Inc., v. United Drug Co., D.C., 272 F. 505; Du Pont Cellophane Co. v. Waxed Products, 2 Cir., 85 F.2d 75
 
 
 [14]
 As an example of this sort of thing, 'Dutch Mill', No. 19 on the tabulation mentioned, was a label used on one paint item in an Albany, N.Y., store. Appellant had never heard of it until after this suit started
 
 
 [15]
 In the Pacific Coast area Uhl Bros. Inc. of Los Angeles and San Francisco sold paint under 23 different labels, one of which was 'Old Dutch'; Tibbetts Corporation of Los Angeles manufactured and sold paint under 8 different names or labels, one of which was 'Royal Dutch'; Security Paint Manufacturing Company of Los Angeles made paint under four names or brands one of which was 'Royal Dutch'; and about a year before the trial appellees found a can of paint in a Standard Brands Paint Store in Los Angeles bearing a label marked 'Dutch Mill Paint'. These four cases made up the whole of the showing of such third party uses in this area. The Uhl Bros. 'Old Dutch' label had been made for ten years prior to 1950, but the Tibbetts 'Royal Dutch' represented a relatively small volume of that concern's sales; the brand had never been advertised, and one dealer carrying Tibbetts' paints had never heard of it. The date given for first use of Security Paint's 'Royal Dutch' was 1944 or 1945. No date or source of manufacture was given for the label found in the Los Angeles store apparently after the suit was begun
 
 
 [16]
 Thus even if appellant were unable, under the rule in United Drug Co. v. Theodore Rectanus, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141, to obtain injunctions in those local areas, that fact would not affect its right to relief elsewhere
 
 
 [17]
 The quoted words are from Equitable Life Assur. Soc. v. Irelan, 9 Cir., 123 F.2d 462, 464. In accord Orvis v. Higgins, 2 Cir., 180 F.2d 537, 539; United States v. Fotopulos, 9 Cir., 180 F.2d 631
 
 
 [18]
 This and other California cases relating to unfair competition were cited by this court in Lane Bryant, Inc., v. Maternity Lane, 9 Cir., 173 F.2d 559, 563
 
 
 [19]
 "If the natural and necessary consequence of said defendant's conduct in this respect was such as to cause deception, said defendant, knowing the facts, must be held to the same responsibility as if it acted under the honest impression that no right of the plaintiff was invaded." As quoted in Lane Bryant, Inc., v. Maternity Lane, supra, 173 F.2d at page 564, from Dodge Stationery Co. v. Dodge, 145 Cal. 380, 78 P. 879. Cf. Straus v. Notaseme Hosiery Co., 240 U.S. 179, 36 S.Ct. 288, 60 L.Ed. 590