**EXPOCONSUL INTERNATIONAL, INC., a New Jersey Corporation, Plaintiff,**

**v.**

**A/E SYSTEMS, INC., a/k/a A/E/C Systems, Inc., a Connecticut Corporation, Defendant.**

**No. 88 Civ. 0877 (PNL).**

United States District Court, S.D. New York.

Feb. 1, 1991.

John J. Jones, Hightstown, N.J., Kenyon & Kenyon, New York City (James E. Rosini, John Flock, Evan H. Katz, of counsel), for plaintiff.

McCormick, Paulding & Huber, Hartford, Conn. (John C. Linderman, John C. Hilton, J. Kevin Grogan, of counsel), Robin, Blecker & Daley, New York City (Albert Robin, of counsel), for defendant.

## OPINION AND ORDER

LEVAL, District Judge.

This is a trademark dispute over the use of the symbol AEC. The defendant, A/E Systems, Inc. (hereinafter "Systems"), the promoter of a trade show exhibiting design systems for construction, employs the registered trademark A/E/C Systems as the name of its show. Plaintiff, Expoconsul International, Inc. (hereinafter "Expoconsul"), subsequently promoted a similar trade show which it named AEC Expo. Plaintiff seeks declaratory relief that its use of AEC Expo does not infringe trademark rights of defendant. The complaint also seeks various other types of relief under federal trademark law, antitrust law and New York common law, including cancellation of plaintiff's registration, and damages. Defendant counterclaims alleging infringement of its trademark.

Expoconsul does not deny the similarity between the two names, but contends that Systems is seeking to enforce trademark rights in a generic designator which under law is inherently unprotectible. Expoconsul moves for partial summary judgment establishing that its use of the name AEC Expo for its trade show does not infringe rights of the defendant.

It is fundamental to the trademark law that not all names are susceptible to protection. Because it serves the public interest

to enable consumers to distinguish between the goods and services of competing suppliers, the trademark law establishes a legally protected monopoly on the use of a name or mark in trade. Exclusive use of a name by one provider in trade enables the consumer public to choose the goods or services of providers who have been satisfactory in the past (or of whom they have heard good reports) while avoiding those who have proved unsatisfactory. The public interest would be disserved, however, if a single competitor were empowered to prevent all others from using the word that designates the good or service being offered. If, for example, only a single electrician were permitted to use the designation "electrician," the ability of the public to distinguish between the reputations of competing electricians would be impaired. "In [such a] case," as Judge Friendly explained, "any claim to an exclusive right must be denied since this in effect would confer a monopoly not only of the mark but of the product by rendering a competitor unable effectively to name what it was endeavoring to sell." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10 (2d Cir.1976); *see CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11 (2d Cir.1975); *see also King–Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577 (2d Cir.1963); *DuPont Cellophane Co. v. Waxed Prods. Co.*, 85 F.2d 75 (2d Cir.), *cert. denied*, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936); *Bayer Co. v. United Drug Co.*, 272 F. 505 (S.D.N.Y. 1921).

The trademark law thus denies protection and allows universal access to names that designate the goods or services offered. The law divides trade names into four categories. *See Abercrombie & Fitch*, 537 F.2d at 9–11. The more distinctive the name, the more protection it receives. On the other hand, the closer the name comes to defining or describing the type or class of the goods, services, or business involved, the less protection it receives. (i) Names which are generic—those which designate the category of goods, services or business—are incapable of protection. All competitors may use them. No one may exclude others from using such designators. *See Abercrombie & Fitch*, 537 F.2d at 9; *CES Publishing*, 531 F.2d at 13–15. (ii) For similar reasons, descriptive marks are disfavored. Presumptively, the law disallows the grant of exclusive rights in descriptive marks; but, in order to avoid confusion and unfairness to users who over time have established a reputation in a descriptive mark, the law compromises, recognizing rights in descriptive marks *if* the user shows that his use of the mark over time has given it a "secondary meaning"—*i.e.*, the public has come to associate the mark with the user. *Abercrombie & Fitch*, 537 F.2d at 10. (iii) Marks which are merely suggestive, rather than descriptive of what is offered, are accorded protection, but not the strongest protection. (iv) The strongest protection is reserved for marks which are arbitrary or fanciful—*i.e.*, those which have no logical connection with the goods or services they cover, serving only as the name of the supplier. *See Abercrombie & Fitch*, 537 F.2d at 9–11.

■ The only similarity between the names used by Expoconsul and Systems lies in the fact that both use the letters AEC. Thus there can be no liability of plaintiff to defendant unless based on plaintiff's use of the letters AEC. Expoconsul has conclusively established that the letters AEC are a term commonly used in the industry to designate the fields of architecture, engineering and construction (or contracting).[1] It has shown that the defendant's use of A/E/C in its name A/E/C Systems designates systems for use in architecture, engineering and construction. This is a generic designation identifying the subject of defendant's trade show. Plaintiff Expoconsul is using the term AEC for the same purpose. The defendant Systems cannot acquire exclusive rights under the trademark laws to exclude plaintiff and

---

**1.** The evidence indicates that the "C" in AEC always refers to the construction trade, though some testified that it stands for "construction," some for "contracting," and some for various combinations of the two.

others from using such a designator in its generic sense.

### General Statement of Fact and Conclusions of Law

The facts are largely undisputed. In 1979, the corporate predecessor of the defendant Systems (then called MRH Associates, Inc.) organized a trade show under the name Systems. This trade show was designed for architects and engineers and focussed on computer systems for use in architecture and engineering. The defendant chose the name Systems to convey the fact that its show was a show of systems.

In 1982, the defendant began publishing a related newsletter entitled A/E Systems Report and changed the name of its show to A/E Systems. The newsletter was directed to architects and engineers, concentrating, like the trade show, on systems for use in those professions. The defendant chose to use the name A/E for the trade show and for the newsletter precisely because that symbol designates architects and engineers, who were the nucleus of the clientele of the newsletter and the trade fair. The name A/E Systems was chosen to convey the fact that the show offered systems for architecture and engineering.

In 1985, the defendant changed the name of the trade fair to A/E/C Systems. The term AEC had been in common use for many years in the industry as designating the fields of architecture, engineering and construction (or contracting). In the intervening period since 1982, the construction industry had become increasingly sophisticated and interested in the use of computer systems, on which the defendant's show concentrated. Contractors, in addition to architects and engineers, had increasingly become a part of the clientele of defendant's show. Thus, defendant's adoption of the term A/E/C, in preference to the previous A/E, was designed to refer to architects, engineers *and construction*

contractors, the public to which the show was directed, while the term A/E/C SYSTEMS referred to systems for use in architecture, engineering and construction, the subject matter of the defendant's show.

In 1987 Expoconsul began to promote a trade fair using the name AEC EXPO, which competed directly with the defendant's show, also exhibiting computer and other systems for use in architecture, engineering and construction. Plaintiff used the symbol AEC in its name for the same reason as the defendant—to signify that the show was directed to the fields of architecture, engineering and construction.[2] Defendant protested Expoconsul's use of AEC, claiming it had exclusive rights. Plaintiff subsequently brought this action to establish its right to use the term AEC in designating its trade show.

On the motion for summary judgment, Expoconsul seeks a finding that plaintiff is not liable to defendant for trademark infringement. I find as a matter of law that plaintiff has put forth a successful defense to defendant's claim of trademark infringement. Plaintiff has demonstrated in a manner that leaves no issue for trial that the term AEC is a generic designator, signifying architecture, engineering and construction contracting and that both defendant and plaintiff are using AEC in their names in this generic sense. Defendant thus cannot bar plaintiff from using this generic designation to identify the subject of plaintiff's show. *See Abercrombie & Fitch*, 537 F.2d at 9–11; *CES Publishing*, 531 F.2d at 13–15.

Plaintiff has presented overwhelming and substantially uncontradicted evidence to support this conclusion. The evidence admits of no other conclusion than that defendant may not bar plaintiff from employing the letters AEC in its name as a generic designator of its trade.

---

**2.** Defendant asserts that plaintiff promoted its show to diverse groups, including some that were not directly involved in architecture, engineering, or contracting. Defendant points to evidence that plaintiff solicited as a potential exhibitor one company whose products are directed primarily to banks and insurance companies. The evidence clearly indicates, however, that plaintiff's show is primarily directed to those in architecture, engineering, contracting, and related fields, even if it also includes some merchandise outside this category.

*Plaintiff's Evidence*

I will review only the plaintiff's most salient evidence:

1. *Use of AEC in the industry as a generic designator of architecture, engineering and construction.* Through numerous sources, plaintiff demonstrated that the letters AEC have long been used and understood in the industry as a reference to architecture, engineering and construction. For example, plaintiff submitted several editions, spanning the years from 1942 to 1971, of the Western States A–E–C Catalogue File, a publication of the Times Mirror Company of Los Angeles, constituting a collection of catalogs of suppliers in the fields of architecture, engineering and construction contracting. The 1942 edition asserts, for example, that "Western States A–E–C Catalog File is an indexed file of manufacturers' catalogs, designed especially for Western Architects, Engineers and Contractors."

Hugh Sharp, Vice President of Product and Planning for Sweet's Division of McGraw Hill, which produces and distributes catalog files of building product information, testified that he had been aware of terms AE and AEC since he had first come to work for Sweet's in 1972; that the term "A/E/C is a relatively common descriptor of a time [type] of firm ... of a kind of practice, if you will, a design construction practice.... Sweet's catalog ... uses [AEC] as an abbreviation, A; A/E; A/E/C—all of those letters are used to connote or to denote specific types of offices." He explained that A stands for architecture or architects, E for engineers or engineering, and C for contractors or contracting.

Similar testimony was given by a Philip Schreiner, Editorial Director of Building Design and Construction Magazine, a professional magazine with a circulation of approximately 81,000 including primarily architects, developers, engineers and contractors. Schreiner testified that since he had started in the business (around 1972) he had been familiar with the term AE as meaning architects and engineers and with the term AEC as meaning architects, engineers and contractors or construction managers.

Plaintiff's evidence also shows that there is a similar trade show in Canada which is entitled the Canadian AEC Exposition. The promotional materials for the show demonstrate that it relates to the fields of architecture, engineering and construction and that the letters AEC in its name are derived from those words. The publicity material also uses the term AEC in text, not as a reference to the name of the exhibition but as a designation of the fields of architecture, engineering and contracting: "The only trade show in Canada previewing automation and computer products for the exciting AEC industry."

Plaintiff has also submitted dozens of examples of professional publications from 1979 to the present which use AEC (sometimes with dashes or slashes separating the letters) to refer to architecture, engineering and construction. These industry publications, from numerous different publishers and suppliers, commonly referred to AEC firms, AEC technology, the AEC market, AEC trends, AEC companies, AEC systems, the AEC industry, AEC professionals, etc. There can be absolutely no doubt from this profusion of examples of such usage in industry publications that the term AEC is commonly used and understood in the industry as a generic designator of architecture, engineering and construction.

2. *Testimony by defendant's officers.* The testimony given by officers of the defendant powerfully confirms the generic significance of the term AEC and the selection of that term in the naming of defendant's trade show as a generic term to designate architecture, engineering and construction:

a) Michael Hough, an owner and director of the defendant, testified that he chose the name A/E Marketing Journal because the name was "descriptive of what it was ..., a marketing newsletter for architects and engineers"; that in his business the term A/E meant "architect/engineer"; that when he sees the term AEC today, it means "architect, engineer, contractor";

that he has communicated with people using the letters AEC to mean architects, engineers and contractors and believes they understand what he means. He testified that his trade show in 1980 was "about production systems for architects and engineers"; that the customers for the show were "AEs" and that the show related to architects and engineers; that it was a show at which makers and providers of systems for AE's would display those systems; that he changed the name of the show in 1982 from Systems to A/E Systems "because we wanted to show that it was a show for architects and engineers"; that the name of the show was subsequently changed from A/E Systems to A/E/C Systems "to reflect the fact that contractors were now attending the show"; that approximately 55% of the public of the show consisted of architects, engineers and contractors and that 10% were "primarily computer consultants for AEC's"; another 10% were "interested in CAD [computer aided design], but were not part of the normal AEC industry" meaning "[a]s we discussed, the normal of architect, engineers, contractors" in the building design and construction industry.

Hough also acknowledged familiarity with "AEC Product Solutions" as a title used at Apple Computer involving Apple products for "this architect, engineer, contractor market."

b) Similar testimony was given by George Borkovich, a co-owner and officer of the defendant, confirming that the defendant uses AEC as a generic designator for architects, engineers and contractors. In telling why the defendant had originally named its show "Systems," Borkovich said "we talked about a variety of systems ...; there were so many different kinds of systems ... management systems ... reprographic systems ... copier systems ... computer systems ... software systems. We felt that this was a generic term." As to why the defendant had eventually changed from A/E Systems to A/E/C Systems, Borkovich said it "more closely defined the audience we were looking at ..., architects, engineers, contractors, anyone that is related to the design and construction industry." Borkovich explained that the defendant had added A/E to the original name Systems "because it defined the show as an architects/engineer show, and then we later changed that to A/E/C because our audience continued to broaden from architects and engineers to encompass the entire design field," of architects, engineers, contractors, and related groups. "When I'm describing my trade show, the A, the E, and the C refer to architectural, engineering and construction as a means of defining what systems are in our trade show."

3. *Usage by the defendant in publications and correspondence.* Plaintiff has submitted numerous excerpts from the defendant's publications and correspondence in which the defendant uses the term A/E/C not as reference to defendant's trade name but to designate architecture, engineering and construction. The defendant's publications repeatedly refer, for example, to the "AEC market" and to "AEC firms," referring to the architecture, engineering and construction market and to firms engaged in architecture, engineering and construction. A survey conducted by the defendant employs AEC in its generic sense, inquiring of respondents, "Are there too many shows for the AEC, FM and Mapping Industry?"

*Defendant's Evidence and Contentions*

The evidence and arguments proffered by defendant are unavailing to rebut the force of plaintiff's proofs.

■ 1. *Secondary meaning.* Defendant proffers evidence to show that its mark has acquired "secondary meaning." It contends that because of such secondary meaning, the mark is enforceable. Defendant's evidence indicates that its A/E/C Systems show was widely attended and that its name is widely known. It appears to be true that during the years in which it has used the name A/E/C, the defendant has advertised extensively and built up a trade recognition in its use of that name. Defendant therefore contends it has established a "secondary meaning."

That, however, does not affect the issue. It is true that one can acquire exclusive rights in a *descriptive* mark by showing that the mark has acquired public recognition (or "secondary meaning," being a public association of the mark with the user). But the same is not true of generic designators. It is a fundamental policy of the trademark law that no individual should be accorded the exclusive monopoly right to bar others from the use of a generic designator. "[E]ven proof of secondary meaning, by virtue of which some 'merely descriptive' marks may be registered, cannot transform a generic term into a subject for trademark.... [N]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, *it cannot deprive competing manufacturers of the product of the right to call the article by its name." Abercrombie & Fitch,* 537 F.2d at 9 (emphasis added).[3]

A term which identifies a category or species is generic, while one which refers to attributes is descriptive. *See Abercrombie & Fitch,* 537 F.2d at 9. Assuming application to tools for carpentry, for example, CARPENTRY TOOLS would certainly be generic, while DURABLE TOOLS would be descriptive. Although there are cases in which it is difficult to apply these differences of category to the trademarks in question, this is not such a case. AEC identifies the category of systems that are the subject of defendant's (and plaintiff's) show (as well as identifying the clientele for which the show is organized). The usage is unquestionably generic rather than descriptive.[4] Thus, even assuming that defendant would be capable of showing at trial that there are people who think of the defendant's show when they hear the term A/E/C, that would be insufficient as a matter of law to permit the defendant to exercise exclusive trademark rights over such a generic designator. *See CES Publishing,* 531 F.2d at 15.

*2. AEC not generic in this context.* Defendant correctly asserts that because the United States Patent and Trademark Office has permitted registration of defendant's mark for A/E/C Systems, the registration is *prima facie* evidence of the validity of the mark which plaintiff has the burden of overcoming. *See Reese Pub. Co. v. Hampton Int'l Communications, Inc.,* 620 F.2d 7, 11 (2d Cir.1980); *Abercrombie & Fitch,* 537 F.2d at 11, 14; *Venetianaire Corp. of America v. A & P Import Co.,* 429 F.2d 1079, 1080 n. 1 (2d Cir.1970). Defendant contends that notwithstanding plaintiff's showing that AEC is used to refer to architecture, engineering and construction, a word can have different meanings in different contexts and that in the context of trade shows, the term A/E/C might be understood as a reference to defendant's show.

Defendant points out that in various cases a word was found to be generic in one application but not in another. *See Abercrombie & Fitch,* 537 F.2d at 9, 11–15 ("a term that is in one category for a particular product may be in quite a different one for another, ... because a term may have one meaning to one group of users and a different one to others, and because the same term may be put to different uses with respect to a single product" (footnotes omitted); "safari" generic for hats and jackets but not for boots, swim trunks, belts, scarves, etc.); *Polo Fashions, Inc. v. Extra Special Prods., Inc.,* 451 F.Supp. 555, 559 (S.D.N.Y.1978)

**3.** The justification for refusing trademark protection to generic terms was recently stated as follows:

Recognition of exclusive rights in generic terms would impede competition in the market for the goods or services denominated by the generic designation. Competitors denied access to a term that identifies the goods or services to prospective purchasers would be left at a distinct disadvantage in communicating information regarding the nature or characteristics of their product.
*Restatement (Third) of Unfair Competition* § 15 comment a (Tentative Draft No. 2) (March 23, 1990) (approved by membership of American Law Institute, May 1990) [hereinafter *Restatement* ].

**4.** "A term that denominates a subcategory of a more general class ... is also generic." *Restatement* § 15 comment a.

("polo" generic for polo shirts and polo coats, descriptive for other shirts and coats, and fanciful as applied to ties and other articles).

Defendant argues that because plaintiff has the burden of overcoming the presumptive validity that flows from federal registration, plaintiff was obligated to produce consumer surveys to show that defendant's A/E/C is understood as a generic designator, rather than as the identifier of defendant's show. In the absence of such evidence, it argues summary judgment should be denied.

In these circumstances, defendant's arguments are not convincing. There is no doubt that defendant's use of A/E/C is both intended and understood by its public as a reference to architecture, engineering and construction contracting. Defendant's officers made clear in their testimony, furthermore, that they had adopted the name to designate both the subject of the show and the public to which their show was directed.

The evidence shows that from the beginnings of the defendant's show in 1979, defendant has always intentionally employed generic terms for its title and has changed the title from time to time solely for the purpose of improving the precision of the generic reference. Defendant originally called its show of systems by the name "SYSTEMS." Later, to reflect that it was a show of systems for use in AE (architecture and engineering), defendant changed the name to A/E Systems. Subsequently, to reflect the fact that construction contractors as well as architects and engineers were increasingly users of such systems and that the systems were increasingly created for consumption by the AEC market (rather than merely the AE market), defendant changed the name to A/E/C Systems.

This case thus has great similarity to two precedents in which the Second Circuit denied relief to a purported trademark owner against a subsequent user because the mark claimed was a generic designator of the product or subject matter covered. In *CES Publishing*, 531 F.2d at 13–15, the publisher of "Consumer Electronics Month-ly" was unable to prevent a competitor from using the name "Consumer Electronics Products News," notwithstanding plaintiff's prior appropriation and its proof that its mark had secondary meaning. The Court of Appeals found the mark generic and thus concluded that plaintiff could not enjoin defendant's use, even if plaintiff could prove secondary meaning. Judge Friendly cited with approval a similar ruling in *Jenkins Pub. Co. v. Metalworking Pub. Co.*, 139 U.S.P.Q. (BNA) 346 (T.T.A.B. 1963), in which the name "Metalworking," for a trade journal about metalworking, was held generic and thus "incapable" of exclusive appropriation, regardless of secondary meaning. And in *Reese Publishing Co. v. Hampton International Communications, Inc.*, 620 F.2d 7 (2d Cir.1980), for the same reason the Second Circuit denied protection to the mark "Video Buyer's Guide" against a subsequently adopted "Hampton's Official 1980 Video Buyer's Guide."

In an attempt to show that its use of A/E/C is not generic, defendant advances three arguments, that are unavailing:

■ (a) Defendant argues that its mark is not generic because its show has come to include material outside the scope of AEC concerns. I agree with defendant that there are circumstances in which a formerly generic designation would cease to be generic because of changes in the nature of the business covered by the mark. The Seamen's Bank for Savings might have started out as a bank expressly created and structured to provide a service for seamen, but over time became a banking facility of general clientele—so that its name, a vestigial remainder of its history, no longer designated its function. (Another example may be the Fireman's Fund.) Such a name would no longer be generic and would be fully protectible, even though it might once have been generic.

The problem with this argument is that it is not supported by the factual record *in this case*. The most defendant has shown is that its show includes some percentage of matter outside the category of AEC concerns. Defendant's show admittedly

*concentrates* on AEC systems, even though it may show some others as well, and its mark refers to its trade in AEC systems. Defendant's evidence has not suggested otherwise. A mark that designates the major category of the user's business does not cease to be generic merely because the user's business includes some aspect outside the scope of the generic designation. Defendant's argument is an extreme example of a tail attempting to wag a dog. It does not raise a material issue of fact.

(b) Second, defendant argues that its use of A/E/C is not generic because persons in the marketplace understand it as a reference to defendant's show. Defendant offers responses to its survey questionnaires, many of which named "AEC" or "A/E/C" as one of "the three top trade shows on [their] exhibition schedule," and a few of which made such comments as "A/E/C is a great show" or "the last AEC was a disaster." Defendant also points to numerous letters that contain usages such as, "we will be exhibiting at AEC" (meaning the defendant's show), or discuss "the possibility of conducting a seminar at the Anaheim AEC show next year," or enclose a check as "payment for space ... at A/E/C."

Although these are indeed examples of members of the relevant public using AEC or A/E/C in a sense other than generic, they are not helpful to defendant. This evidence does not purport to show that A/E/C no longer carries its generic significance among defendant's public. Such evidence shows only that, in addition to its generic significance, A/E/C is sometimes also understood as a reference to defendant's show. In other words, this is evidence that defendant's mark has acquired a secondary meaning—that defendant's public associates defendant's mark with defendant (or its show). As noted above, however, the law is clear that secondary meaning is legally irrelevant in the case of a generic trademark. Although proof of secondary meaning will save the user's rights in a descriptive mark, it cannot convert a generic mark into a protectible one. That is because of the overriding importance of allowing all competitors to call their product by a name that tells the world what kind of product it is. *Abercrombie & Fitch*, 537 F.2d at 9; *CES Publishing*, 531 F.2d at 13–15. Thus, a night club which called itself "The Club" and became famous and fashionable so that countless people made dates to meet "at The Club," would, nonetheless, be powerless to bar other night clubs from using "Club" in their name.[5]

(c) Finally, defendant may be arguing that its name A/E/C Systems should not be considered generic because the species identified by the name is not the service offered by the defendant—that being a trade show—but rather the subject matter of the trade show. The argument is unsound both factually and legally. As a factual matter, A/E/C, as used in defendant's name, does indeed identify the product offered by the defendant. What defendant is offering is a trade show for AECs where they can shop for AEC systems. That is the species identified by the defendant's trade name. The name is no less generic because it leaves to inference the word Show, calling itself AEC Systems, rather than AEC Systems Show. The name "Antiques Show," for example, would be no less generic if it were shortened to "Antiques."[6]

---

**5.** As the *Restatement* explains,

> Success in achieving an association between a generic term and a particular user will not overcome the prohibition against the recognition of exclusive rights.... [E]xtensive promotion and commercial success may result in the creation of secondary meaning for a designation that formerly had only generic significance. Prospective purchasers may come to understand the designation, at least in some contexts, as an indication of source, and for some consumers its generic significance may

> become subordinate. The existence of such de facto secondary meaning, however, does not result in the acquisition of trademark rights.

*Restatement* § 15 comment b.

**6.** In any event, such an argument (if defendant is making it) defines generic marks too narrowly. A mark need not identify the *goods* the user is selling to be generic. A mark is generic if it is understood "to denominate the general category, type, or class of the goods, services, *or busi-*

■ More importantly, the argument is unsound as a proposition of law in that it confuses the issue of infringement, which is the question relevant to this portion of the summary judgment motion, with the issue of registrability.[7] The issue here is not whether the defendant's mark, *as a whole*, is generic and thus not capable of being registered. Rather, the issue is whether the plaintiff is infringing defendant's trademark rights by using *part* of the defendant's mark. Even if a mark has distinctive components which render it registrable and protectible, the mark may also contain generic components, which others remain free to use. Bethlehem Steel, Goodyear Tire, and Allied Chemical, for example, are unquestionably protectible trademarks. It does not follow that the owners of such marks can prevent competitors in the steel, tire and chemical industries from using the words steel, tire, or chemical as a part of their names. Similarly, the issue addressed here is not whether "A/E/C Systems," taken as a whole, is a generic mark that cannot be registered. The issue is whether defendant can prevent plaintiff from using AEC in its generic sense as a part of plaintiff's name. The answer to that question is clear: it cannot. *Abercrombie & Fitch*, 537 F.2d at 9.

Thus, although it is unquestionably true that words and symbols can have different meanings in different contexts, plaintiff has demonstrated conclusively that defendant is using that symbol in precisely the context in which it refers to the AEC industry.

3. *Confusion in the market.* Defendant advances evidence that the simultaneous use of AEC by plaintiff and defendant will cause confusion. This may be true, but it is irrelevant to the question of *trademark rights.* The trademark laws offer a means to avoid confusion. Defendant's problem results from its failure to

avail itself of those means. Had the defendant chosen a distinctive trade designator—one which is imaginative, fanciful, arbitrary, or suggestive, no competitor would be permitted to use the same, or even a confusingly similar name. Defendant chose, however, to call itself by a name which identifies its business. It was predictable that a competitor would use similar terminology in either its name or its advertising. Indeed, the evidence shows that a second similar trade fair in Canada also uses AEC in its name. Any confusion results, at least in part, from defendant's failure to employ a distinctive protectible name. If plaintiff has acted in a manner designed to cause confusion and has sought to piggyback on defendant's goodwill, defendant may have rights under the law of unfair competition for misrepresentation of source. *See, e.g.,* 15 U.S.C. § 1125. But that does not make a generic designator enforceable as a trademark.

\* \* \*

■ Ten years ago, defendant's arguments against a grant of summary judgment might have prevailed, requiring plaintiff to incur the expense of trial in order to secure judgment. For many years, courts of appeals routinely cautioned district courts against grant of summary judgment if any conceivable possibility existed that facts could be produced at trial. The practice as to summary judgment has changed substantially, however, since the Supreme Court's decisions in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).[8] By those rulings, the Supreme Court emphasized the provisions of Fed.R.Civ.P. 56(e) that where the moving party has shown entitlement to summary judgment in its moving papers, summa-

---

*ness with which it is used." Restatement* § 15 (emphasis added).

**7.** As stated below, to the extent plaintiff does seek summary judgment cancelling defendant's registered trademark, that part of the motion is denied.

**8.** *See* Issacharoff and Loewenstein, *Second Thoughts About Summary Judgment,* 100 Yale L.J. 73, 88–91 (1990).

ry judgment will be granted unless the "adverse party ... set[s] forth specific facts showing that there is a genuine issue for trial."

Under these standards, defendant's arguments and proffers fail to demonstrate the existence of a "genuine" issue for trial. Its rebuttal is merely hypothetical.

It is, of course, true that plaintiff has failed to put forth market surveys. Defendant argues, therefore, that the party having the burden of proof has failed to supply evidence of a potentially crucial nature. If plaintiff had supplied market surveys, however, defendant could argue that surveys are biased and unreliable and that defendant must be given the opportunity at trial to rebut or impeach the surveys before the fact-finder. Theoretically, there is always better evidence that could be produced.

In this instance, however, plaintiff has submitted uncontradicted evidence that the term AEC (or A/E/C, without differentiation) refers, as a generic designator, to the fields of architecture, engineering and construction contracting and that both plaintiff and defendant are using the term *in that market* and in that sense. Abstract incantation of the possibility that words can have different meanings in different contexts is insufficient to forestall grant of summary judgment. Expoconsul is entitled to judgment to the effect that it is not infringing defendant's mark; it should not be required to incur the expense and delay of a trial. Thus in similar circumstances, in *CES Publishing*, 531 F.2d at 15, the Court of Appeals directed the entry of summary judgment.[9]

### Conclusion

Expoconsul's motion for summary judgment is granted to the extent that judgment will be entered ruling that Expoconsul is not liable to defendant Systems for trademark infringement for Expoconsul's use of AEC in the name of its trade show.

9. Although the Court of Appeals used the term "dismissal" of the complaint, rather than summary judgment, it is clear that summary judgment was involved. The dismissal was pretrial and based on the evidence adduced at the pre-

As to the other aspects of plaintiff's motion, including the prayer for cancellation of defendant's mark, and declaratory judgment of non-liability for unfair competition, summary judgment is denied, as plaintiff has failed to show that there are no issues for trial or that plaintiff is entitled to judgment as a matter of law.

SO ORDERED:

liminary injunction hearing. Based on that evidence, the Court concluded that the mark "Consumer Electronics Monthly" was generic and could not support exclusive rights under the trademark law.