**HORIZON MILLS CORP., Plaintiff,**

v.

**QVC, INC., Defendant.**

**No. 00 Civ. 2278(AGS).**

United States District Court, S.D. New York.

March 30, 2001.

12. Ulstein USA is now known as UU Inc. and is incorporated in Delaware.

Stephen J. Quigley, Michael Aschen, Jeffrey A. Schwab, Abelman, Frayne & Schwab, Harlan M. Lazarus, Lazarus & Lazarus, P.C., New York City, for Plaintiff Horizon Mills Corp.

Steven B. Pokotilow, Laura E. Goldbard, Strook & Strook & Lavan, L.L.P., New York City, for Defendant QVC, Inc.

## OPINION AND ORDER

SCHWARTZ, District Judge.

This action, filed on March 24, 2000, arises out of defendant's use of the term "Slinky" to advertise women's apparel for home shopping customers. Plaintiff, the owner of the trademark in SLINKY for "fabrics used in clothing and household products," alleges claims for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and New York law and dilution under Section 360–1 of the New York General Business Law. Defendant moves for summary judgment as to each of plaintiff's claims on the ground that plaintiff's mark is generic. For the reasons set forth below, the motion is denied.

## I. Factual Background

Plaintiff Horizon Mills Corp. ("Horizon")[1] is a corporation organized and existing under the laws of New York, with its

---

1. The original owner of the trademark at issue in this case was purportedly Horizon Textiles, Inc., which assigned the mark to plaintiff on July 30, 1999. (Schechter Decl. ¶ 12.) In this Order, "Horizon" refers to both entities unless otherwise noted.

principal place of business in New York, New York. (Complaint ("Compl.") ¶ 3.) It is a textile converter, involved primarily in developing and marketing both knit and woven textiles for the "womanswear" trade. (Declaration of Joel Schechter dated Aug. 29, 2000 ("Schechter Decl.") ¶ 2.) Defendant QVC, Inc. ("QVC") is a corporation organized and existing under the laws of Pennsylvania with its principal place of business in West Chester, Pennsylvania. (Compl.¶ 4.) According to QVC, it has been engaged since 1986 in the business of providing home-shopping retail services. In addition to its cable television network, it also operates an online retail service called "iQVC," and markets goods through mail-order catalogs and retail outlets in Pennsylvania and Delaware. (Memorandum of Law in Support of Motion for Summary Judgment ("Def.Mem.") at 18.) Through these commercial channels, QVC markets, *inter alia*, women's apparel made from acetate and spandex and man-made fibers, under certain private labels and other brand name designers. (Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10.)

Horizon alleges that its first use of the term "slinky" as a mark in connection with fabrics, specifically a combination of acetate and spandex, occurred on July 16, 1991. (Defendant QVC, Inc.'s Local Rule 56.1 Statement of Material Facts As to Which There is No Genuine Issue to be Tried ("Def.56.1") ¶ 1; Plaintiff's Local Rule 56.1 Statement of Material Facts As to Which There is A Genuine Issue to Be Tried ("Pl.56.1") ¶ 1; Schechter Decl. ¶ 4.)

On September 16, 1993, Horizon filed an intent to use application for registration of the mark SLINKY in the United States Patent and Trademark Office ("PTO").[2] On November 7, 1995, the mark was registered on the Principal Register covering the use of said mark on "fabrics used in the manufacture of clothing and household products." (Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4.)

Since Horizon's first use in 1991, certain members of the media, trade, and consuming public have come to employ the term "slinky" to describe a stretchy, fluid or sinuous-looking fabric normally consisting of acetate or spandex, and used in dresses and women's sportswear. QVC states that it uses the terms "slinky," "slinky knit," and "slinky fabric" to describe such fabric and the apparel made therefrom. (Def. Mem. at 19–20.) Plaintiff filed this action to enjoin such use on the ground it is infringing, and to recover damages. Prior to discovery, QVC moved for summary judgment on the ground that the generic nature of the terms in question bar Horizon's claims. QVC's argument is twofold. First, it contends that the term "slinky" was generic to the relevant category of products prior to Horizon's use and registration. (Def. Mem. at 2–6, 21–23.) Second, it contends that the public has appropriated the term "slinky" for the stretchy, fluid, and sinuous fabric and women's apparel made from acetate, spandex and other man-made fibers, therefore precluding exclusive use of the term by any manufacturer. (Def. Mem. at 19.)

---

**2.** Prior to Horizon's first use, a federal trademark registration in SLINKY for "greige and finished fabrics in the piece of all types for use in men's, women's, and children's apparel, in home furnishings, and in the industrial field" issued on May 18, 1965 to Klopman Mills, Inc., and was subsequently assigned to Burlington Industries, Inc. ("Burlington"). This SLINKY mark was renewed by Burlington in 1985. (*See* Declaration of Stephen J. Quigley dated August 31, 2000 ("Quigley Decl."), Ex. 2.) When Horizon applied for a trademark in SLINKY, registration was initially denied because of the trademark owned by Burlington. Burlington's mark was cancelled on August 11, 1994 as a result of a cancellation proceeding in the Patent and Trademark Office initiated by Horizon. (Ex. 4 to Schechter Decl.)

Horizon contends that the references to "slinky" fabrics or garments in the media and trade are not generic references, but rather references to its trademarked fabric. (Def. 56.1 ¶¶ 7–9; Pl. 56.1 ¶¶ 7–9.)

## II. Discussion

### A. Summary Judgment Standard

A district court may grant summary judgment only if it is satisfied that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, which may be satisfied if it can point to the absence of evidence necessary to support an essential element of the non-moving party's claim. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All inferences and ambiguities are resolved in favor of the party against whom summary judgment is sought. *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir.1994) (citations omitted).

If the moving party meets its burden, the opposing party must set forth "specific facts showing there is a genuine issue for trial." Rule 56(e); *see also Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir. 1988) ("[W]here the moving party has attempted to demonstrate that the nonmoving party's evidence is insufficient as a matter of law to establish his claim, the burden shifts to the nonmoving party to come forward with persuasive evidence that his claim is not 'implausible'.") (citation omitted). When reasonable minds could not differ as to the import of the proffered evidence, then summary judgment is proper. *Anderson*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). Moreover, "mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996). Further, although the determination of the genericness of a trademark is a question of fact, *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1039 (2d Cir.1992), such determination may be made on a motion for summary judgment. *See, e.g., GMT Prods. v. Cablevision of New York City*, 816 F.Supp. 207, 210 (S.D.N.Y.1993); *Gear, Inc. v. L.A. Gear California, Inc.*, 670 F.Supp. 508, 514 (S.D.N.Y.1987), *vacated in part pursuant to settlement*, 13 U.S.P.Q.2d 1655 (S.D.N.Y.1989).

### B. Generic Terms under Trademark Law

#### 1. Generic versus Descriptive Terms

■ Terms are classified in four categories for the purposes of trademark protection. In increasing degrees of distinctiveness, and protectibility, the categories are: (i) generic, (ii) descriptive,[3] (iii) suggestive, and (iv) arbitrary or fanciful. *See Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075–76 (2d Cir.1993); *Abercrombie*, 537 F.2d at 9–11 (describing each category).

■ A term is generic when it refers to the genus or class of product, rather than a particular product; a generic term is one which is commonly used as the name for a type of goods. *Murphy Door Bed Co. v.*

---

**3.** Descriptive terms are often referred to as "merely descriptive," while generic terms are also referred to as "common descriptive" names. *See, e.g., Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10 (2d Cir. 1976).

*Interior Sleep Sys., Inc.,* 874 F.2d 95, 100 (2d Cir.1989) (citing *Abercrombie & Fitch,* 537 F.2d at 9); *Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75, 79 (7th Cir.1977). The generic name of a product can never function as a trademark to indicate the origin of that product. *Murphy Door Bed,* 874 F.2d at 101 ("Neither statutory law, namely the Lanham Act, nor common law supports a claim for trademark infringement when the mark in question is generic.") As McCarthy states, "[t]he name of a product or service itself—what it is—is the very antithesis of a mark." 2 McCarthy on Trademarks and Unfair Competition § 12–1 at 12–3 (4th ed.1999) (hereinafter "McCarthy"). Moreover, as Judge Friendly observed, to permit exclusive trademark rights in a generic name "would grant the owner of a mark a monopoly, since a competitor could not describe his goods as what they are." *CES Publ'g Corp. v. St. Regis Publications,* 531 F.2d 11, 13 (2d Cir.1975). The trademark laws are primarily consumer protection laws, designed to prevent confusion among the public resulting from fraud and deception in the marketing and sales of products. *See Robot Wars LLC v. Roski,* 51 F.Supp.2d 491, 494 (S.D.N.Y.1999); 1 McCarthy §§ 2.1–2.2 at 2–2 to 2–3. With generic terms, such protection is unnecessary, because consumers understand exactly what they are buying by knowing the name; the source of the goods is immaterial. *See Bayer v. United Drug Co.,* 272 F. 505, 509–10 (S.D.N.Y.1921) (stating that relief under the trademark laws "always depends upon the idea that no man shall be allowed to mislead people into supposing his goods are the plaintiff's, and that there can be no right or remedy until the plaintiff can show that at least presumptively this will result").

■ Descriptive terms are those that describe a thing, or "how it is," rather than name that thing, or "what it is".[4] McCarthy's § 12–19 at 12–52. As one court of this district has stated, "The distinction between descriptive and generic terms is one of degree. A generic name conveys information with respect to the nature or class of an article, whereas a descriptive term supplies the characteristics and qualities of the article, its color, order, function, dimensions." *Gear,* 670 F.Supp. at 514 (citations and internal quotations omitted). This Court recognizes the difficulty involved in precisely defining the generic and descriptive categories; "[t]he lines of demarcation ... are not always bright." *Abercrombie & Fitch Co.,* 537 F.2d at 9. Nevertheless, the distinction is critical because "if determined to be generic, [a] term can never function as a mark or be given trademark protection; but if determined to be descriptive, the term can be given trademark protection upon proof of secondary meaning," referring to consumers' recognition of the term and association with a source. McCarthy's § 12–20 at 12–53; *see Abercrombie & Fitch Co.,* 537 F.2d at 9–10.

## C. Testing Genericness

■ The test for genericness is based upon a term's "primary significance" to the buying public. As Judge Learned Hand stated: "The single question ... in all these cases, is merely one of fact: What do buyers understand by the word for whose use the parties are contending?" *Bayer,* 272 F. at 509; McCarthy § 12:9 at 12–19

---

4. A suggestive term suggests rather than describes an ingredient or characteristic of the goods and "requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Abercrombie & Fitch,* 537 F.2d at 11 (citation omitted). An arbitrary term is a common term applied in an unfamiliar way, and a fanciful term normally refers to words invented or coined solely for their use as trademarks. *Id.* at 11 & n. 12.

("It is the use and understanding of the term in the context of purchasing decisions ... that determines the primary significance of a designation.") (citation omitted). A term is generic when the majority of the buying public associates the term with a product, rather than the source of the product, whether the source is known or unknown. *See King–Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577, 579–81 (2d Cir.1963); McCarthy § 12:6 at 12–15. In general, the buying class refers to consumers, rather than professionals in the trade. *Something Old, Something New, Inc. v. QVC*, 1999 WL 1125063, 53 U.S.P.Q.2d 1715, 1720 (S.D.N.Y.1999) (citing McCarthy § 12:4 at 12–11).

■ Courts have determined terms to be generic, and hence unprotectible, under two principal circumstances. The first case is where a seller appropriates an existing generic term and claims exclusive rights in it as a "trademark" of that term. In such a case, because the term was generic before the seller used it,[5] the seller never had trademark rights in the term. An individual challenging the mark need only establish that the term is generic through an examination of the term itself. Notable examples include "flor-tile" as a mark for wooden flooring, "The Computer Store" for computer sales services, "cola" for a type of soft drink, "fontina" for a type of cheese, "baby oil" for mineral oil, and "hog" for large motorcycles. *See In re Tibbals Flooring Co.*, 1962 WL 8663, 135 U.S.P.Q. 374 (Trademark Tr. & App. Bd.1962) (flor-tile); *In re Computer Store, Inc.*, 211 U.S.P.Q. 72 (Trademark Tr. &

App. Bd.1981) (The Computer Store); *In re Cooperativa Produttori Latte E Fontina Valle D'Acosta*, 1986 WL 83578, 230 U.S.P.Q. 131 (T.T.A.B.1986) (fontina); and *Dixi–Cola Laboratories v. Coca–Cola Co.*, 117 F.2d 352 (4th Cir.1941) (cola); *Johnson & Johnson v. Carter–Wallace, Inc.*, 487 F.Supp. 740 (S.D.N.Y.1979) (baby oil); *Harley Davidson*, 164 F.3d 806 (hog).

Generic terms need not only be nouns that directly name a product, but also may be adjectives that designate a distinctive characteristic of a genus of products. One well-known example is the Seventh Circuit's decision finding "Light Beer" and "Lite Beer" to be generic names for a type of beer light in body or taste and low in alcoholic and caloric content. *See Miller Brewing Co.*, 561 F.2d at 79–81. Other notable examples of adjectives held to be generic are "matchbox" for a type of toy car, "warehouse" in the context of its use as a shoe store, "safari" as applied to the specific types of clothing one would wear on a safari, and "super glue" for certain strong, rapid-setting adhesives. *See J. Kohnstam, Ltd. v. Louis Marx & Co.*, 47 C.C.P.A. 1080, 280 F.2d 437 (Cust. & Pat. App.1960) (matchbox); *Mil–Mar Shoe v. Shonac Corp.*, 75 F.3d 1153 (7th Cir.1996) (warehouse shoes); *Abercrombie & Fitch Co.*, 537 F.2d 4 (safari clothing); *Loctite Corp. v. Nat'l Starch and Chem. Corp.*, 516 F.Supp. 190 (S.D.N.Y.1981) (super glue).

The second case in which courts have determined a mark to be generic involves matters where a seller establishes trademark rights in a term which a majority of the relevant public then appropriates as

---

**5.** The Court's assessment of whether a term is generic focuses on the date of first use of the mark by the seller, rather than the date of registration of the mark, which, as in the instant case, could come some years later. *Cf. Am. Thermos Prods. Co. v. Aladdin Indus., Inc.*, 207 F.Supp. 9, 11 (D.Conn.1962), *aff'd*, 321 F.2d 577 (2d Cir.1963) (basing determi-

nation of genericness on the commencement of plaintiff's commercial activity with respect to the mark, where registration was obtained one year later); *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 809 (2d Cir.1999) (judging genericness based on commercial use, where term was registered).

the name of a product. In such a case, the mark is said to be a victim of "genericide" and trademark rights may cease. The public's appropriation is set in motion by two, often concurrent processes, namely, (i) the trademark owner's failure to police the mark, resulting in widespread usage by competitors, and (ii) the public's inability to call the product by any other name than the trademarked term. Notable examples include "aspirin" for acetyl salicylic acid, "cellophane" for transparent cellulose sheets and films, "escalator" for a moving stairway, "Murphy Bed" for a bed that folds into a closet; and "Thermos" for vacuum-insulated bottles. *See Bayer*, 272 F. 505 (aspirin); *Dupont Cellophane Co. v. Waxed Products Co.*, 85 F.2d 75 (2d Cir. 1936) (cellophane); *Haughton Elevator Co. v. Seeberger*, 1950 WL 4178, 85 U.S.P.Q. 80 (Com'r Pat. & Trademarks 1950) (escalator); *Murphy Door Bed*, 874 F.2d 95 (Murphy Bed); *King–Seeley*, 321 F.2d 577 (Thermos).

The evidence used to show a term's common usage and understanding by the relevant public is varied. Courts have relied upon evidence such as: (i) proof of widespread use by competitors that has not been contested by the seller; (ii) generic use by the seller himself; (iii) dictionary definitions; (iv) media usage, such as newspaper or magazine articles; and (v) consumer surveys. McCarthy's §§ 12–13, 12–14 at 12–28 to 31; *Harley Davidson*,

164 F.3d at 811 (quoting *Murphy Door Bed*, 874 F.2d at 101); *In re Northland Aluminum Prods., Inc.* 777 F.2d 1556, 1559 (Fed.Cir.1985). While none of such evidentiary sources are required for a finding of genericness, it is unlikely that any of them, standing alone, will constitute conclusive proof that the contested mark has been appropriated by the public. *See Murphy Door Bed*, 874 F.2d at 101 (stating that while both dictionary definitions and newspaper and magazine use of a term reflect the public's perception, neither was "proof positive" of such perception).

## D. Burdens of Proof When Plaintiff Has a Registered Trademark

Under Section 14 of the Lanham Act, 15 U.S.C. § 1064, a registered mark may be cancelled at any time.[6] *Id.* § 12:60 at 12–115. "If the registered mark becomes the generic name for less than all of the goods or services for which it is registered, a petition to cancel the registration for only those goods or services may be filed." 15 U.S.C. § 1064. While formal cancellation proceedings are generally held before the PTO, under 15 U.S.C. § 1119,[7] this Court may also direct the PTO to cancel a mark.

 If a plaintiff has a federal trademark registration, it constitutes a strong presumption that the term is not generic, or, if merely descriptive, is accorded secondary meaning by the relevant public.[8]

---

**6.** That section reads as follows: "A verified petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed by any person who believes that he is or will be damaged by the registration of a mark on the principal register [of trademarks]." 15 U.S.C. § 1064.

**7.** This section states in pertinent part: "In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in

whole or in part, restore cancelled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."

**8.** If the term is not federally registered, courts have found that once defendant raises the defense of genericness, the plaintiff bears the burden of proving trademark status. *See Nat'l Conference of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478 (7th Cir.1982); *Reese Publ'g Co. v. Hampton Int'l*

*Something Old, Something New,* 1999 WL 1125063, 53 U.S.P.Q.2d at 1720; *Liquid Controls Corp. v. Liquid Control Corp.,* 802 F.2d 934, 936 (7th Cir.1986). However, the presumption is rebuttable; defendant bears the burden of overcoming the presumption. The Seventh Circuit has held that while a contestable federal registration is prima facie evidence that the term is not generic, such presumption "bursts" when the defendant presents sufficient evidence of genericness, e.g., in the evidentiary forms outlined *supra. Liquid Controls,* 802 F.2d at 936–37 & n. 2 (in affirming summary judgment finding "liquid controls" to be a generic term, stating that "the burden is on the defendant not only to overcome whatever presumption of nongenericness exists, but also to show that there is no genuine issue of material fact as to genericness). In the face of such evidence, the plaintiff may not simply rely upon the registration as sufficient evidence to preclude summary judgment." *Id.* at 938. The Second Circuit has stated that the "presumption of non-genericness" in the case of a product name for which there are allegations of public appropriation is justified by the "commercial protection a developer of innovations deserves." *Murphy Door Bed,* 874 F.2d at 101.

### E. Validity of Horizon's Mark

On this summary judgment motion, QVC argues that Horizon's SLINKY mark is invalid because it is generic. The Court must presume the SLINKY mark to be valid because it has been federally registered since 1995. Such registration constitutes prima facie evidence of Horizon's exclusive right to use the term "Slinky" to refer to certain clothing and household products made of acetate and spandex. The burden of production therefore shifts to QVC to provide evidence that the mark

is generic. *Id.* Here, the Court finds, QVC has not adequately met its burden of showing either that (i) that Horizon appropriated a previously generic term for use as a trademark, or that (ii) the term's principal significance among the buying public is a type of material rather than an indication of the source of such material.

### 1. "Slinky" before Horizon's First Use

Contrary to QVC's contention, (Def. Mem. at 2–6, 21–23), neither the current record nor generally accepted English usage enable the Court to conclude that "slinky" was a generic term when associated with women's apparel before Horizon's first use in 1991. Rather, the adjective "slinky" was, and still is, a descriptive term capable of trademark protection upon a showing of sufficient secondary meaning.

The Court agrees with QVC's analysis that "slinky" is a "common *descriptive* name," and that "the term 'slinky' has long been used in connection with fabric to *describe* lush, fluid, and clinging fabrics that have a close fit on the figure." (Def. Mem. at 2–3; Reply Memorandum of Law In Support of Defendant QVC Inc.'s Motion for Summary Judgment at 1.) Evidence from dictionary sources supports this point. In particular, the unabridged *Random House Dictionary of the English Language* 1341 (1983), defined "slinky" especially in relation to women's clothing as "made of soft, often clinging material and fitting the figure closely so as to enhance or flatter one's appearance and movements." The unabridged *Webster's Third New International Dictionary* 2143 (1981) defined "slinky" as used in women's clothing to mean "following the lines of the figure in a graceful flowing manner." The *American Heritage Dictionary* 1697 (3d

*Communications, Inc.,* 620 F.2d 7 (2d Cir. 1980).

ed.1984) described "slinky" in the context of an outfit as "[g]raceful, sinuous and sleek." The *Oxford English Dictionary* 711 (2d ed.1989) defined "slinky" in relation to a garment as "close-fitting, as if moulded to the figure." The definition has been couched in similar terms since 1991.[9] *See, e.g., Webster's II New Riverside University Dictionary* 1095 (1994) (defining "slinky" in the context of a gown as "[g]raceful, sinuous, and sleek"); *The Wordsmyth English Dictionary–Thesaurus* (http://www.wordsmyth.net) ("of clothing, flowing, clinging, and sensuous: Example: slinky fabric; a slinky cocktail dress"). Further, evidence of media usage prior to Horizon's first use in 1991 also shows that "slinky" described fluid, clinging, and sinuous fabrics. *See, e.g.,* Judy Jeannin, "Donna Karan," *The Record (NJ)*, Nov. 14, 1985, at U08 ("If there is a quibble with the Karan collection it is that few women have the perfectly toned bodies required to wear most of the clothes, and that slinky fabrics allow the outline of the body suits to show through the skirts."); Diane Reischel, "L.A. Designers Go Their Own Ways in Spring '86 Collections, *Los Angeles Times*, Nov. 22, 1985, at 1 (describing the "L.A. look" to include "slinky dress fabrics with a knack for revealing or most kindly disguising the body"); (*see* Declaration of Salvatore Guerriero dated July 13, 2000 ("Guerriero Decl."), Exs. 9–13.)

However, the Court disagrees with QVC that such sources reflect that "slinky" was generic as to certain women's apparel before Horizon first used the term, as opposed to merely descriptive. As the above references demonstrate, the adjective "slinky" describes the characteristics or qualities of several classes of garments which have a sinuous, sleek texture that hugs the body, rather than identifying a specific material or garment. *Cf. Gear, Inc.*, 670 F.Supp. at 514. The term does not identify *what* a product is, but rather *how* several products are. The critical distinction may be observed by comparing this case to the Seventh Circuit cases considering the protectibility of the adjectival terms in "light beer" and "tasty salad dressing." In the former case, *Miller Brewing Co.*, 561 F.2d at 80–81, the court found that the term "light," when applied to "beer," had long referred to a class of beer with a light color, flavor, body, alcoholic content, or a combination of these elements. The court therefore found that the plaintiff's proposed trademark, "Light Beer" or "Lite Beer," was generic because such terms clearly identified a particularly genus of alcohol.[10] The court stated that it could no more grant the plaintiff an exclusive right to identify its beer as "light" than it could grant an individual such right to call his wine "rose," his whisky "blended," or his bread "white." *Id.* at 81. Such adjectives define what the product is, rather than certain qualities or characteristics

---

9. The Court finds that QVC has provided an adequately representative sample of dictionaries, given that each of the sources it cites contains an essentially equivalent definition. They are not "highly selective" as Horizon inexplicably contends. (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pl.Mem.") at 12.) The additional definition that Horizon supplies in its motion papers parallels those offered by QVC; although it does not specifically make reference to clothing, it defines "slinky" as "sinuous or graceful in movement." *Webster's*

*New Twentieth Century Dictionary* 1708 (1979).

10. The court also rejected the defendant's argument that "light beer" was protectible because "light" had not theretofore been used to refer to a "less filling" or "low calorie" beer, on the ground that "less filling" meant "light in body" and "low calorie" depends primarily on alcoholic content. *Miller Brewing Co.*, 561 F.2d at 81.

of the product. In contrast, the same court determined that the adjective "tasty" was descriptive in reference to salad dressing. The Court stated that unlike "light beer," "tasty salad dressing" is "not a kind, sort, genus, or subcategory of salad dressing ... It is not an adjective which in any way serves to *classify* the noun to which it is attached." *Henri's Food Prods. Co. v. Tasty Snacks, Inc.*, 817 F.2d 1303, 1306 (7th Cir.1987). Thus, the court found that "tasty" and its phonetic equivalent "tastee" could be protected upon proof of secondary meaning. *Id.* Similarly, the Court of Customs and Patent Appeals found that the term "custom blended" was descriptive in relation to gasoline, *In re Sun Oil Co.*, 57 C.C.P.A. 1147, 426 F.2d 401 (Cust. & Pat. App.1970), and the Trademark Trial and Appeal Board found "softsoap" to be descriptive of certain forms of soap, *In re Minnetonka, Inc.*, 1987 WL 124303, 3 U.S.P.Q.2d 1711 (Trademark Tr. & App. Bd.1987); *cf. Expoconsul Int'l Inc. v. A/E Sys.*, 755 F.Supp. 1237, 1243 (S.D.N.Y. 1991) (assuming application of tools for carpentry, comparing "carpentry tools," which would be generic, with "durable tools," which would be descriptive).

■ Like "tasty," "custom blended," or "softsoap," the term "slinky," as it existed before Horizon's use and registration, did not classify the garments to which it was attached, e.g. "slinky evening gown" or "slinky dress," but rather described the visual or textual characteristics of such garments. Horizon adopted the descriptive term in developing its new material consisting of acetate and spandex most likely because its material had similar qualities to garments that had historically been described as slinky. Horizon itself described its product as "a knit fabric using bright acetate and spandex ... [which] allows the fabric, and hence, garments to drape in a very natural manner which is highly flattering to the wearer." (Schechter Decl. ¶ 4.) Accordingly, the Court finds that Horizon's mark is not an historically generic term, but a descriptive one, and that with sufficient secondary meaning,[11] could be protectible as a trademark.[12]

## 2. SLINKY After Horizon's First Use

Even if the term "slinky" were not generic prior to Horizon's first use, it would still be generic if the *current* public perception of the term supported such finding. While QVC has presented approximately 60 examples of the term's media usage from 1991 to the present—in magazine and newspaper articles, trade publications, and Internet advertisements (Guerriero Decl., Exs. 14–74)—the Court declines to find, on this evidence alone, that the primary significance of "slinky" to the buying public is merely a product, without association with Horizon as the source.

■ The media sources that QVC cites are frequently ambiguous as to the public perception of the products at issue. First, more than one half of the periodical articles originate from a trade publication, *Women's Wear Daily.* (Exs. 14–16, 18, 20, 22, 29, 32–40, 43–45, 47–48, 50–51, 53, 57, 63, 65 to Guerriero Decl.) The opinion of trade professionals or fashion experts is not the focus of a test of genericness for a mass consumed product such as the "slinky" garments at issue; rather, the test is the "common usage or understand-

11. The issue of secondary meaning with reference to this case is addressed in note 18, *infra.*

12. As Horizon points out, such finding is supported by the fact that "the PTO did not [ ] raise a descriptiveness objection and granted [Horizon's] registration" in 1995, and the existence of a federal registration in SLINKY for "over three decades" previous to Horizon's registration. (Pl. Mem. at 5–6.)

ing by the general public." *Something Old, Something New*, 53 U.S.P.Q.2d at 1720; *Bayer*, 272 F. at 509. It is clear from the content of such articles that they are written for a community of individuals that is familiar with the women's apparel industry, not the general buying public. While such public *may* include certain wholesale or retail buyers, McCarthy § 12:5 at 12–15 ("In an appropriate case, the buying class could include professional buyers."),[13] these individuals, by themselves, cannot be considered representative of the public perception.[14]

Second, there is significant ambiguity in many of the sources as to the object of the "slinky" designation. In those articles which use "slinky" as an adjective, it is not clear whether the word is used to refer to apparel consisting of acetate and spandex, or merely to describe the sinuous, close-fitting, and flattering nature of such products. (*See* Ex. 16 to Guerriero Decl. ("slinky fabric of acetate and Lycra")); *Id.* Ex. 30 ("the slinky retro tops, typically made of lycra or spandex, that fit close to the body"); *Id.* Ex. 33 ("The fabric is 'slinky' and gives the garment nice drape."); *Id.* Ex. 49 ("flattering to the heavy-set women is a slinky acetate-spandex fabric used for tunics"); *Id.* Ex. 54 ("While the DuPont slinky fabric is decidedly down market"); *Id.* Ex. 59 ("DKNY Kids looks that take advantage of Lycra's properties include ... slinky knit tank

tops and apron dresses"). Further, although they do not refer directly to Horizon, several references to "slinky" are either in quotations or capitalized, which may indicate a reference to the trademarked product as opposed to a commonly descriptive usage. Several of the periodical references also demonstrate this ambiguity. (*See id.* Ex. 18 (the "acetate and Lycra rib with a distressed look the firm calls Slinky")); *Id.* Ex. 21 ("manufacturers are using innovative fabrics, such as the shiny spandex-like material "Sparkle Slinky"); *Id.* Ex. 41 ("a luxurious acetate spandex material aptly called "slinky fabric"); *Id.* Ex. 43 ("develop a line of large-size fashions featuring, for example 'slinky', a stretch fabric"); *Id.* Ex. 45 ("There are plenty of 'slinky' cardigans, shirts, and skirts in rayon and acetate."); *Id.* Ex. 62 ("she likes to wear jeans, paired with a 'Slinky' T-shirt"); *Id.* Ex. 64 ("a new fabric simply known as 'slinky' fabric"). Similar ambiguity pervades most of QVC's Internet references and the company's own use of the "Slinky" on its iQVC retail site. (*See, e.g., id.* Ex. 67) ("Slinky is an incredible fabric that looks great on all sizes and body types ... Dresses and sportswear made of Slinky are perfect for work, casual, or dressy occasions; *Id.* ("Detailed Index of Nylon Acetate 'Slinky' Lycra")); *Id.* (SLINKY $13.95 yd ... Sewing with Slinky is quick and easy ... ); *Id.* Ex. 70 ("Slinky Knit and Stretch Lace

---

**13.** QVC states that the "relevant consumers in the case at bar [are] the millions of people who buy fabrics and the clothes made therefrom." This subset of individuals may therefore include both merchants and retail consumers. (Def. Rep. at 8). However, it concludes that "[g]iven the significant use of slinky by those in the *industry*, along with dictionary evidence, as indicating genericness, the only reasonable conclusion that can be drawn is that slinky is generic." (*Id.* at 7.) (emphasis added). While the manner in which slinky is used in the cited publica-

tions and advertisements may reflect or influence the understanding of the public, QVC has failed to present sufficient evidence demonstrating such effect. (*Id.* at 5.)

**14.** Several of the Internet sources also appear to be from websites of fabric or fashion industry concerns, (Ex. 67 to Guerriero Decl.), and the Internet advertisements for specialized apparel such as band, dance, and skating only minimally support the buying public's perception of the term "slinky." (*Id.* Ex. 68–69.)

Chemise"); *Id.* Ex. 71 ("Slinky Two–Piece Set Asymmetric tunic"); *Id.* Ex. 72 ("Delta Burke Glitter Top and Jacket with Velvet Skirt, Separates: Plus Size Coordinates include: Glitter Slinky Short Sleeve Square Neck Top"); *Id.* Ex. 73 ('The Slinky Collection: The slinky knits are a today fabric blend of Acetate/Lycra Stretch knits that have a tight sheen and ribbed texture."); *Id.* Ex. 74 ("Regina Kravitz Slinky Pull-on Pants ... The slinky fabric hangs very well on the body ...").

Third, contrary to QVC's suggestion, the absence of mention of the trademark holder and the absence of a trademark designation (e.g. ® or TM) in the media is not significant evidence of the generic nature of a mark. 15 U.S.C. § 1111 (stating mechanism by which "a registrant of a mark registered in the [PTO] *may* give notice that his mark is registered") (emphasis added). The two articles that do mention Horizon by name recognize it as the trademark holder and, apparently in deference to Horizon's rights, capitalize the term "Slinky." (Ex. 25 to Guerriero Decl.) ("The acetate/Lycra fabrics called Slinky Knit (a term trademarked by Horizon Fabrics but commonly used to describe similar fabrics from other manufacturers) has been taking the fashion world by storm, appearing in the lines of top designers and manufacturers and in all the clothing stores."); *Id.* Ex. 26 ("Although the name Slinky knit has been trademarked by Horizon Fabrics, it is also used to describe similar fabrics made by other mills.") While the authors' recogni-

tion that "slinky" is "commonly used to describe similar fabrics by other manufacturers" indicates that there may be substantial infringing activity, the acknowledgment of the trademark holder's rights reflects that the buying public is aware of such rights and suggests that "genericide" has not occurred.[15]

Fourth, the characterization of the "slinky" fabric as "new" by sources published over the last five years also indicates that the public perception may not be uniform, and it is too early to tell whether the term has been so adopted by the public as to become generic. (*Id.* Ex. 27 (stating in Nov. 1998 article, What in the world is this new fabric called slinky knit?)); *Id.* Ex. 35 (stating in Oct. 1996 article that "[n]ovelties like chenille, velour, and slinkies in acetate, nylon and polyester-rayon blends have been doing very well"); *Id.* Ex. 46 (stating in Sept. 1997 article that "[n]early new is slinky, a clingy Lycra-like material"); *Id.* Ex. 64 (describing in Mar. 2000 article "a new fabric simply known as 'slinky' fabric"); *cf. King–Seeley*, 321 F.2d at 579 (holding that "Thermos" mark had become part of the public domain because of several factors which occurred between 1907 and 1962); *Murphy Door Bed*, 874 F.2d at 101 (holding that "Murphy Bed" was a generic term and describing process by which the Murphy Bed became generic, which occurred over several decades).

Fifth, the media sources that QVC provides are the only evidence it presents to

---

**15.** The record reflects that the public has been substantially exposed to SLINKY as a mark owned by Horizon. *Cf. Bayer*, 272 F. at 510–11, 513 (finding that ASPIRIN mark was generic in part because only members of the "drug trade" were ever exposed to the source of the product). In addition to the published periodical materials, Horizon itself has promoted the mark by labeling and applying

"hangtags" to certain garments, as well as advertisements in certain trade publications. (Schechter Decl. ¶¶ 5–9, Exs. 2, 3.) Horizon also asserts that it has made diligent promotion efforts through (i) direct marketing to retailers and/or the purchasing public, and (ii) television sales, including a segment on the Home Shopping Network, which is a direct competitor of QVC. (*Id.* ¶¶ 5–7, Ex. 1.)

show that SLINKY has become generic. QVC's other source of evidence, dictionary definitions, do not indicate that the public associates the term "slinky" with a particular product; as noted *supra*, such definitions merely describe the characteristics of slinky garments, i.e. sinuous, graceful, and close-fitting. *Cf. id.*, 874 F.2d at 101 (noting that "the term Murphy bed is included in many dictionaries as a standard description of a wall-bed"). Although consumer surveys are not required, they "have become almost de rigeur in litigation over genericness." McCarthy's § 12:14 at 12–31; *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225 (2d Cir.1999) (noting that consumer surveys are "routinely employed" in testing the genericness of a mark); *cf. Am. Thermos Prods. Co.*, 207 F.Supp. 9 (addressing the "Thermos Survey" which asks participants how they would identify a particular product given that it performs certain functions, in an effort to identify if the name of the product is generic); *E.I. DuPont de Nemours and Co. v. Yoshida Int'l, Inc.*, 393 F.Supp. 502 (E.D.N.Y.1975) (addressing a "Teflon Survey" in which participants are given a series of names and asked whether those names are brand names or common names, in an effort to discern how the public perceives each name). In a case such as the instant one, where the term at issue is not a household name, the Court finds that, on summary judgment, a consumer survey would be particularly helpful in divining what the principal significance of "slinky" is to the consuming public.[16] *Cf. Gimix, Inc. v. JS&A Group, Inc.*, 1982 WL 52164, 213 U.S.P.Q. 1005, 1006 (N.D.Ill.1982) (finding that both sides were "at fault" for their "laxness" in not having produced consumer surveys or similar evidence).

██ The record reflects that Horizon's "Slinky" fabric has become a commercial success, both to Horizon and to other fabric manufacturers. (Schechter Decl. ¶¶ 5–8, Ex. 2; Guerriero Decl.) Several other mills are currently manufacturing similar fabrics and selling them on the market under the "slinky" designation. It also appears, from the evidence submitted by QVC, that Horizon's mark has been adopted by an undefined percentage of the buying public as a generic term for fabrics or women's apparel consisting of acetate and spandex, or like materials.[17] Horizon itself concedes that its fabric has been "copied in some instances, along with its brand name," and the record reflects that Horizon has only managed to defend its mark against misuse with respect to a small number of offenders. (Pl. Mem. at

---

**16.** QVC relies on two cases in support of its argument that a consumer survey is unnecessary here; however, both courts addressed whether a term was generic before it was applied as a trademark to the products in question. *See Gimix, Inc. v. JS & A Group*, 699 F.2d 901, 905 (7th Cir.1983) (finding that where it was not alleged that the term turned generic, it was only necessary to determine whether the term was a commonly used and understood term prior to its association with the products at issue); *Expoconsul*, 755 F.Supp. at 1247 (finding that survey evidence was clearly not necessary in light of the substantially uncontroverted evidence supporting the conclusion that "AEC" was understood by the public as a generic designator). Such cases are inapposite where, as here, the term was not a generic term prior to Horizon's use of it for its product.

**17.** The public may be more apt to associate "slinky" with a fabric type rather than its source because the adjective "slinky" is commonly used to refer to garments with similar characteristics to such fabric. Contrary to Horizon's suggestion, its mark does not appear comparable in strength to KLEENEX, XEROX, or COCA COLA, which have also purportedly suffered damage from infringing uses. (Pl. Mem. at 4.) It may be more akin to ROLLERBLADE, the manufacturer of in-line skates, an example also cited by Horizon. (*Id.* at 7.)

4, 7 (stating that Horizon has policed "[w]ithin the limits of its means"); Schechter Decl. ¶ 11, Ex. 5.) There are clear policy considerations militating in favor of granting summary judgment, namely, preventing Horizon from gaining an effective monopoly by preventing use of the "slinky" term by its competitors, who must be able to describe the genus of their fabrics. *Cf. CES Publ'g*, 531 F.2d at 13 ("To allow trademark protection for generic terms, i.e. names which describe the genus of goods being sold, even when these have become identified with a first user, would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are.") However, this remedy can be harsh on a business, because "it places a penalty on the manufacturer who has made skillful use of advertising and has popularized his product." *King–Seeley*, 321 F.2d at 581. As discussed *supra*, the test for classifying a term as generic is the primary significance of that term to the buying public. Given the fact that the SLINKY mark is registered, QVC's failure to produce evidence sufficient to demonstrate how the public truly perceives the term "slinky" leaves genuine issues of material fact as to each of Horizon's claims. Accordingly, because the Court finds that a genuine issue of material fact exists as to whether "slinky" has become generic, and therefore, whether it is still entitled to protec-

tion as a trademark upon a showing of secondary meaning,[18] *see Bristol–Myers*, 973 F.2d at 1039, QVC's motion for summary judgment must be denied.[19]

### III. Conclusion

For the foregoing reasons, QVC's motion for summary judgment is denied.

**SO ORDERED.**

---

**18.** There are issues of fact which preclude the Court from making a finding as to secondary meaning on this summary judgment motion. The record is sparse on evidence relating to the existence of secondary meaning in SLINKY. QVC did not address the issue in its motion papers, and Horizon, which ultimately has the burden of proving secondary meaning, only makes conclusory statements thereto in its papers. *Cf. Gimix, Inc.*, 699 F.2d at 907–08 (finding, on secondary summary judgment motion, that term "Auto Page" was merely descriptive and was not protectible because plaintiff failed to establish

secondary meaning, where the plaintiff used the term inconsistently over a short period of time); *Flexitized, Inc. v. Nat'l Flexitized Corp.*, 335 F.2d 774, 779–80 (2d Cir.1964) (upholding trial court's conclusion that the descriptive term "Flexitized" had acquired no secondary meaning).

**19.** To the extent Horizon has made a motion for a continuance to conduct additional discovery pursuant to Fed.R.Civ.P. 56(f), the motion is denied as moot.